UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ELI LILLY AND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>INSTANT RX INC.; DAVID AULOV; THOMAS JOHNSON; DISPENSING PHYSICIAN CONSULTANTS, INC. d/b/a IRA'S DISCOUNT PHARMACY; SOFKO LLC d/b/a (1) IRA'S DISCOUNT PHARMACY & (2) TOTAL CARE PHARMACY; GEORGE DROGARIS a/k/a GEORGE DROGRARIS; PROKOPIOS PANAGAKOS a/k/a (1) KOKO, (2) PANAGAKOS PROCOPIOS, & (3) PROCOPIOS PANAGAKOS; SUE A. PEPPER; MIRJANA TASIC-PANTIC; GLEN COVE DRUGS INC.; SIMEON PINKHASOU; YURIEL SEZANAYEV; HALIMA SYED; LALIBELA, LTD. d/b/a ELITE PHARMACY; YAKOV BEREZHINSKY; YURIY LITVAN; CHRISTINA TOLIS; T & F DRUGS INCORPORATED d/b/a ATLAS DRUG & NUTRITION; and FRANCISCO MARCOS,<br><br>Defendants. | : | FILED<br>IN CLERK'S OFFICE<br>US DISTRICT COURT<br>*JUNE 9, 2026*<br>BROOKLYN OFFICE<br><br>Case No. 26-CV-3429<br><br>**FILED *EX PARTE* AND UNDER SEAL**<br><br>Judge Natasha C. Merle<br>Magistrate Judge Joseph A. Marutollo |

**<u>COMPLAINT AND JURY DEMAND</u>**

## SUMMARY OF THE ACTION

1. Lilly brings this action to put an immediate stop to the Defendants' sale of diverted, misbranded, counterfeit, and potentially dangerous versions of Lilly's medicines, which bear Lilly's trademarks ("Lilly-Branded Medicines").

2. The Defendants in this action are licensed pharmacies, their owners and other principals, and their pharmacists-in-charge. They are all members of a criminal scheme to sell and distribute counterfeit and/or misbranded versions of Lilly-Branded Medicines through members-only online marketplaces that are invisible to manufacturers, government regulators, and law enforcement. These marketplaces provide the Defendants with an ideal black market through which to move their illegal wares.

3. Some of the pharmacies are brick-and-mortar stores that have branched out to illegal online sales of prescription drugs. One is a pharmacy in name only, using fraudulently obtained licensure and an empty storefront to provide the façade of being an independent drugstore, when in reality its entire business is selling counterfeit and misbranded prescription drugs through the Internet. All of the Defendants are knowingly preying upon patients to turn an illicit profit.

4. The Defendants' scheme begins by targeting vulnerable patients who have been dispensed authentic Lilly-Branded Medicines and convincing them to sell their medicines for cash. The Defendants and their co-conspirators target vulnerable patient populations, who receive authentic medication at no cost, depriving them of their doctor-ordered medicine in exchange for cash.

5. The Defendants and their co-conspirators then process these already-dispensed Lilly-Branded Medicines: they collect and gather them, store them in unknown conditions, remove the prior patient labeling, and sell them as though they are new, authentic Lilly-Branded Medicines, when in reality they are black-market goods purchased off the street.

6. The Lilly-Branded Medicines at the heart of the Defendants' scheme are injectable, cold-chain products: as a matter of patient safety – and as required by FDA regulation – they must be shipped and stored between 2 and 8 degrees Celsius and can only be stored at room temperature for a limited window. The Defendants have no idea what conditions these products were stored in after they were originally dispensed to the vulnerable patients who re-sold them for cash, and the Defendants have little incentive to maintain proper quality controls as they illegally process these black-market goods for resale.

7. The Defendants sell these potentially unsafe, black-market medicines online through "pharmacy-to-pharmacy" marketplaces (the "Platforms"). These online Platforms allow pharmacies to post offers to sell any prescription medicine at any price, without requiring any proof that the medicines are legitimate. These postings are accessible only to member pharmacies, who must upload their pharmacy licensure in order to obtain membership. The Defendants use these Platforms to sell their black-market Lilly-Branded Medicines to pharmacies around the country, including in this District, offering the drugs at a price below Lilly's wholesale price.

8. Except under highly limited circumstances, pharmacies are not allowed to sell prescription medicine to other pharmacies – selling to pharmacies is the job of drug wholesalers, which must receive special pharmaceutical wholesaler licensure. The Platforms permit bad actors like the Defendants to illegally sell prescription drugs in massive quantities, allowing them

to act as unlicensed wholesalers. These Platforms provide an ideal unmonitored and *de facto* unregulated black market for the Defendants to sell inauthentic, misbranded brand-name medicines.

9. The pharmacies who purchase Lilly-Branded Medicines from the Defendants on the Platforms receive inauthentic, black-market medicines in the mail, shipped under conditions that violate Lilly's strict quality controls for cold-chain products. The purchasing pharmacies then dispense the medicines to their unwitting patients. Those patients are entitled to receive – and they or their insurers pay as though they were receiving – new, authentic, and safe Lilly-Branded Medicines, manufactured and shipped according to Lilly's quality controls. Instead, patients unknowingly put their health at risk by injecting themselves with black-market, street-purchased medicine that has not been properly refrigerated, which was dispensed to them by their local pharmacy.

10. Lilly brings this action first and foremost to protect patients prescribed genuine Lilly medicines by their healthcare providers. It is imperative that the production and distribution of these dangerous infringing, counterfeit, and diverted Lilly-Branded Medicines be immediately stopped. The Defendants' scheme is criminal and violates numerous federal and state laws and regulations, but the Defendants' sale of inauthentic, black-market versions of Lilly-Branded Medicines also violates Lilly's trademark rights as an American manufacturer and trademark holder. Lilly therefore brings this civil lawsuit to exercise its rights under the Lanham Act and other federal and state laws to enjoin the Defendants from selling counterfeit and infringing versions of its medicines, and to shut down this dangerous pharmaceutical black market.

11. Specifically, Lilly seeks both temporary and permanent injunctive relief, including an asset freeze and a temporary restraining order, preliminary injunction, and permanent injunction against all Defendants prohibiting them from selling Lilly-Branded Medicines. Lilly seeks other injunctive and monetary relief against the Defendants for counterfeiting and trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); false advertising in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; and common-law unfair competition and unjust enrichment.

## THE PARTIES

### A. PLAINTIFF

12. Lilly is a public corporation organized under the laws of the State of Indiana, with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Lilly discovers, develops, manufactures, and markets innovative medicines. Throughout its 150-year history, Lilly has worked to address some of the most pressing challenges facing humanity, including infectious disease, diabetes, depression, cancer, obesity, and Alzheimer's disease. Last year, more than 55 million people used Lilly's medicines.

13. Lilly invests heavily in research and development ("R&D"), and invests approximately 25% of its revenue each year into R&D. In 2025, Lilly invested over $13.33 billion in R&D activities, and employed approximately 12,000 people in R&D, including a substantial number of physicians, scientists holding graduate or postgraduate degrees, and highly skilled technical personnel.

14. Lilly develops and markets FDA-approved medicines that bear its trademarks, including Trulicity® and Mounjaro®.

15. Lilly is the owner of certain well-established and famous registered trademarks that appear on Trulicity® and Mounjaro®'s packaging, accompanying pedigrees, included instructions for use, and the injection delivery systems used to self-administer Trulicity® and Mounjaro®.

**B. DEFENDANTS**

**1. The Instant Rx Defendants**

16. Instant Rx Inc. ("Instant Rx") is a retail pharmacy formed under New York law located in Queens, New York. Although Instant Rx's retail pharmacy location closed in early 2025, Instant Rx has continued to sell prescription pharmaceuticals through pharmacy-to-pharmacy Platforms.

17. Instant Rx sold counterfeit and infringing Lilly-Branded Medicines, including Trulicity®, to U.S. pharmacies.

18. David Aulov ("Aulov") is an individual residing in New York, New York. Aulov is the owner and a principal of Instant Rx. Aulov supervised, ratified, and/or personally participated in the trafficking of counterfeit and Lilly-Branded Medicines. As a principal of Instant Rx, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

19. Thomas Johnson ("Johnson") (together with Instant Rx and Aulov, the "Instant Rx Defendants") is an individual residing in Fort Lauderdale, Florida. Johnson maintains active pharmacist licenses in New York and Florida. Johnson is the supervising pharmacist of Instant Rx. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C.

§ 360eee *et seq.*, and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Instant Rx, Johnson supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Johnson also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise his authority to stop it.

**2. The Ira's Discount Pharmacy Defendants**

20. Dispensing Physician Consultants, Inc. d/b/a Ira's Discount Pharmacy ("DPC") is a retail pharmacy formed under Florida law located in Delray Beach, Florida.

21. Sofko LLC ("Sofko") is a retail pharmacy with a principal place of business in Delray Beach, Florida that does business under two names: Ira's Discount Pharmacy and Total Care Pharmacy. Sofko and DPC are collectively referred to herein as "Ira's Discount Pharmacy."

22. Ira's Discount Pharmacy sold counterfeit and infringing Lilly-Branded Medicines, including Trulicity®, to U.S. pharmacies, including pharmacies located in New York and in this District.

23. George Drogaris a/k/a George Drograris ("Drogaris") is an individual residing in Staten Island, New York. Drogaris is a licensed pharmacist in New York and Florida. He is a principal of Ira's Discount Pharmacy and is an owner of both corporate entities through which Ira's Discount Pharmacy operates. Drogaris oversees Ira's Discount Pharmacy's business operations from his home in this District. Drogaris supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Ira's Discount Pharmacy, Drogaris personally financially benefited from the

trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

24. Defendant Prokopios Panagakos a/k/a (i) Koko, (ii) Panagakos Procopios, and (iii) Procopios Panagakos ("Panagakos") is an individual residing in Boca Raton, Florida. Panagakos is a principal of Ira's Discount Pharmacy and runs the day-to-day operations of the pharmacy. Panagakos supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Ira's Discount Pharmacy, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

25. Sue A. Pepper ("Pepper") is an individual residing in Boca Raton, Florida. Pepper maintains active pharmacy licenses in both New York and Florida. Pepper is the supervising pharmacist of DPC. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of DPC, Pepper supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Pepper also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise her authority to stop it.

26. Mirjana Tasic-Pantic ("Tasic-Pantic") (together with Ira's Discount Pharmacy, Drogaris, Panagakos, and Pepper, the "Ira's Discount Pharmacy Defendants") is an individual residing in Lake Worth, Florida. Tasic-Pantic is the supervising pharmacist of Sofko. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines

purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Sofko, Tasic-Pantic supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Tasic-Pantic also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise her authority to stop it.

**3. The Glen Cove Drugs Defendants**

27. Glen Cove Drugs Inc. ("Glen Cove Drugs") is a retail pharmacy formed under New York law located in Glen Cove, New York.

28. Glen Cove sold counterfeit and infringing Lilly-Branded Medicines, including Trulicity®, to U.S. pharmacies, including at least one pharmacy in this District.

29. Simeon Pinkhasou ("Pinkhasou") is an individual residing in Queens, New York. Pinkhasou is a principal and owner of Glen Cove Drugs. Pinkhasou supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Glen Cove Drugs, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

30. Yuriel Sezanayev ("Sezanayev") is an individual residing in Queens, New York. Sezanayev is a principal of Glen Cove Drugs. Sezanayev supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Glen Cove Drugs, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

31. Halima Syed ("Syed," and together with Glen Cove Drugs, Pinkhasou, and Sezanayev, the "Glen Cove Drugs Defendants") is an individual residing in Sayreville, New Jersey. Syed is the supervising pharmacist of Glen Cove Drugs. Among other things,

supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Glen Cove Drugs, Syed supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Syed also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise her authority to stop it.

**4. The Elite Pharmacy Defendants**

32. Lalibela, Ltd. d/b/a Elite Pharmacy ("Elite Pharmacy") is a retail pharmacy formed under Pennsylvania law located in Philadelphia, Pennsylvania.

33. Elite Pharmacy sold counterfeit and infringing Lilly-Branded Medicines, including Trulicity®, to U.S. pharmacies, including at least one pharmacy in this District.

34. Yakov Berezhinsky ("Berezhinsky") is an individual residing in Ambler, Pennsylvania. Berezhinsky is a principal and owner of Elite Pharmacy. Berezhinsky supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Elite Pharmacy, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

35. Yuriy Litvan ("Litvan") is an individual residing in Meadowbrook, Pennsylvania. Litvan is a principal and the vice president of Elite Pharmacy. Litvan supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of Elite Pharmacy, he personally financially benefited from the trafficking of counterfeit and infringing Lilly-Branded Medicines and failed to exercise his authority to stop it.

36. Christina Tolis ("Tolis") (together with Elite Pharmacy, Berezhinsky, and Litvan, the "Elite Pharmacy") is an individual residing in Warminster, Pennsylvania. Tolis is the supervising pharmacist of Elite Pharmacy. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Elite Pharmacy, Tolis supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Tolis also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise her authority to stop it.

**5. The Atlas Drug Defendants**

37. T & F Drugs Incorporated d/b/a Atlas Drug & Nutrition ("T&F") is a pharmacy chain formed under New Jersey law. T&F is also registered to do business in Florida and New York.

38. T&F has six retail pharmacy locations, one of which operates under the name Atlas Drug & Nutrition ("Atlas Drug"). T&F acquired Atlas Drug in or around 2019. Atlas Drug was a retail and compounding pharmacy in Wyckoff, New Jersey.

39. Atlas Drug sold counterfeit and infringing Lilly-Branded Medicines, including Mounjaro®, to U.S. pharmacies, including at least one pharmacy in this District.

40. Francisco Marcos ("Marcos" and with T&F, the "Atlas Drug Defendants") is an individual residing in Wykoff, New Jersey. Marcos is the owner and a principal of T&F, including its Atlas Drug location. Marco supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. As a principal of T&F and

Atlas Drug, he personally financially benefited from the trafficking of diverted Lilly-Branded Medicines and failed to exercise his authority to stop it.

41. Marcos is also the supervising pharmacist of Atlas Drug. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Atlas Drug, Marcos supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Lilly-Branded Medicines. Marcos also personally financially benefited from the trafficking of counterfeit and diverted Lilly-Branded Medicines and failed to exercise his authority to stop it.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

43. The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

44. As alleged herein, Drogaris, the Instant Rx Defendants (other than Johnson) and the Glen Cove Drug Defendants (other than Syed) are located in and are residents of New York.

45. As alleged herein, all Defendants transacted business in New York and committed tortious acts in New York in connection with the counterfeiting and diversion scheme described herein. Each Defendant sold infringing Lilly-Branded Medicines from a location in New York or into a location in New York. Additionally, Drogaris, the Glen Cove Drug Defendants (other

than Syed), and the Instant Rx Defendants (other than Johnson) operated their businesses from New York.

46. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because multiple Defendants are located in and reside in this District. Further, venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because all Defendants sold or conspired to sell counterfeit and/or infringing medicines into this District, and thus a substantial part of the events giving rise to Lilly's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. LILLY'S MEDICINES

47. Trulicity® and Mounjaro® are Lilly-branded injectable medicines administered at home by patients on a weekly basis. Millions of Americans use Trulicity® and Mounjaro® weekly.

48. Trulicity® is a once-weekly injectable indicated to improve glycemic control in patients living with type 2 diabetes. Trulicity® is a GLP-1 receptor agonist. The active ingredient in Trulicity® is dulaglutide.

49. Mounjaro® is a once-weekly injectable indicated to improve glycemic control in patients living with type 2 diabetes. Mounjaro® is a glucose-dependent insulinotropic polypeptide (GIP) receptor and GLP-1 receptor agonist. The active ingredient in Mounjaro® is tirzepatide.

50. Authentic Trulicity® and Mounjaro® come in packages of four single-use, pre-filled delivery devices ("pens") and include in the package separate instructions for use and prescribing information, each of which contains information crucial for patients (together, "Patient Information Documents"). For example, the instruction for use include information about how a patient should administer their medicine. The prescribing information includes

important warnings and drug interactions. The FDA approves the Patient Information Documents for each product and requires that they be included in each authentic package of Trulicity® and Mounjaro®. Authentic, complete Patient Information Documents are part of the product that Lilly sells.

51. In the United States, the only wholesalers to whom Lilly sells Lilly-Branded Medicines are Lilly-authorized distributors, also known as Lilly's authorized distributors of record, which Lilly publicizes on its website. The Defendants have at all relevant times been aware of Lilly's distribution of its medicines through Lilly-authorized distributors, which is a well-known fact in the industry and consistent with the practices of other major pharmaceutical manufacturers. Lilly sells Trulicity® and Mounjaro® to its authorized distributors at list price.

52. List price, also referred to as wholesale acquisition cost or WAC, is the price at which Lilly sells its products to wholesalers. The prices patients pay at the pharmacy may be different and largely depend on the out-of-pocket costs set by their insurance provider, pharmacy charges, and/or discounts or financial assistance that may be available to the patient.

53. However, there is no legitimate reason why a retail pharmacy would regularly sell Lilly-Branded Medicines to other retail pharmacies on a Platform for prices significantly below Lilly's list price – and certainly not at large volumes. Lilly is the only source for Lilly-Branded Medicines, and pharmacies can return expired or near-expired Lilly-Branded Medicines for a refund, minus a 10% fee. Moreover, pharmacies selling on pharmacy-to-pharmacy Platforms incur additional costs, because they must pay a percentage of the sales price as a fee to the Platform itself. If pharmacies selling on the Platforms at volume were buying authentic Lilly-branded medicines from the legitimate supply chain, they would be losing substantial money on every sale.

**B. LILLY'S TRADEMARKS AND TRADE DRESS**

54. Lilly owns a number of well-established and famous registered trademarks that cover Lilly-Branded Medicines (collectively, the "Lilly Marks"). A list of trademarks relevant to this action is attached hereto as **Exhibit A**.

55. Lilly owns and uses distinctive packaging (the "Lilly Trade Dress") to distinguish Lilly-Branded Medicines in the marketplace.

56. Lilly used and currently is using the Lilly Marks and the Lilly Trade Dress in commerce in connection with its sale of Lilly-Branded Medicines, including Trulicity® and Mounjaro®, and plans to continue such use in the future.

57. Lilly prominently displays the Lilly Marks and Lilly Trade Dress in its advertising and promotional materials.

58. Lilly has engaged and continues to engage in activities designed to promote Lilly-Branded Medicines and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.

59. All of the Lilly Marks and the Lilly Trade Dress symbolize the business goodwill of Lilly and are invaluable assets to Lilly.

**C. LILLY'S QUALITY-CONTROL STANDARDS**

60. Lilly employs extensive and strict quality controls over all of its Lilly-Branded Medicines, including Trulicity® and Mounjaro®. The Lilly Marks and Lilly Trade Dress convey to patients and consumers that Lilly-Branded Medicines have been subject to Lilly's quality controls.

**1. Temperature Controls and Monitoring**

61. Trulicity® and Mounjaro® are cold-chain products that must be stored and transported between 2 and 8 degrees Celsius. Lilly has extensive quality-control procedures in place to ensure these medicines are maintained within those temperatures.

62. For example, Lilly ensures that transportation of Trulicity® and Mounjaro® to Lilly warehouses or to purchasing distributors is accomplished by refrigerated trucks that meet strict specifications meant to ensure the products stay within the designated temperature range. These trucks are all outfitted with temperature monitors that will provide an alert if there is any deviation from that temperature range. Lilly runs regular tests to ensure those temperature monitors are accurate.

63. If a temperature monitor indicates there was any deviation from the temperature range in transport, a quality-control event is triggered and the affected units of Trulicity® or Mounjaro® are quarantined upon delivery and are held until they can be analyzed by a Lilly team of quality-assurance professionals. The product remains quarantined until the quality-assurance team is able to determine, based on the scientific data available, that the medicines remain fully safe and effective for human use. If the quality-assurance team is not able to make such a determination, the affected product is destroyed.

64. When shipping individual units or a small number of units, Lilly's quality-control procedures require that Trulicity® and Mounjaro® be shipped in specialized containers that will maintain the temperature of the medicine. Lilly extensively tests these containers before approving their use, including by field-testing their use in high-temperature summer days and low-temperature winter days. Each such Lilly-approved container for individual or a small number of units is tested to maintain the requisite temperature range for a designated period of

time, and those products are shipped via next-day delivery. If there is any delay in delivery that would potentially lead to product being delivered outside that window of temperature-control effectiveness, Lilly has systems in place to have the product automatically returned to Lilly rather than delivered to the end user.

**2. Targeted Recalls**

65. Lilly also has extensive quality-control protocols related to recalls, including targeted recalls. If there is an issue with a Lilly-Branded Medicine that requires a recall, unlikely as that is, Lilly executes that recall by lot or batch number and gives notice through its legitimate supply chain to the distributors and pharmacies that received medicines from the affected lot or batch. Targeted recalls are preferable to non-targeted recalls when only certain lots or batches are implicated, because they avoid confusing entities that never received the affected lot, and because they avoid "recall fatigue," where companies become accustomed to seeing inapplicable recall notices and so stop paying attention to them. When products are diverted from Lilly's authorized supply chain, it makes it impossible to properly conduct a targeted recall.

**3. Pedigrees and Transaction Information**

66. Each unit of Lilly-Branded medicine is accompanied by what is known in the industry as a "pedigree" as it passes through the distribution chain from the Lilly-authorized distributor to the dispensing pharmacy, as required by the DSCSA. The pedigree is required to provide a full "transaction history" – a chain of custody for that individual unit of medicine going back to the original sale manufacturer. Lilly maintains and provides the initial transaction information when it makes the original sale to a Lilly-authorized distributor, and then for each subsequent sale, the seller is required to provide the purchaser with an updated pedigree reflecting that latest sale.

67. Historically, pedigrees have been documents (on paper or as PDF files) that accompany the physical unit of medicine as it changes hands. Recent FDA regulations have implemented an electronic data exchange system, known as EPCIS, to send and receive transaction information. FDA deadlines to adopt the EPCIS system were repeatedly extended; large pharmacies were exempt from the EPCIS system until late 2025, and smaller pharmacies remain exempt until November 2026.

68. Whether transmitted as a document or as information in the EPCIS electronic system, accurate pedigree information that comports with the DSCSA is part of the product that Lilly sells. At each step in the supply chain, pedigree records identify the Lilly-Branded Medicine at issue and provide information about the individual unit of medicine being sold, as well as when and to whom a specific medicine was bought by and sold from. This information can be crucial in a quality investigation of a product.

69. Unlawfully diverted medicines, such as already-dispensed medicines that are purchased from patients and resold as new, by definition cannot have valid pedigrees. A valid pedigree cannot state as part of the transactional history that it was purchased from a patient off the street. Lilly of course would never permit a Lilly-Branded Medicine that had already been dispensed to a patient to be resold or re-dispensed.

70. Thus, sellers of unlawfully diverted medicines often refuse to provide the required transaction histories or provide pedigrees with inaccurate transaction histories. Inaccurate or missing pedigrees make it difficult to trace the distribution of suspect products.

**4. Lilly's Packaging and Patient Information Documents**

71. Trulicity® and Mounjaro® are dispensed in Lilly's original, FDA-approved, unopened packaging. Lilly includes FDA-required Patient Information Documents inside every

package of authentic Trulicity® and Mounjaro®. Among other materials, the Patient Information Documents include instructions for use, which are particularly important because Trulicity® and Mounjaro® are injectable medicines that patients self-administer.

**D. THE PHARMACY-TO-PHARMACY PLATFORMS**

72. The Defendants sold diverted, misbranded, trademark infringing, and counterfeit Lilly-Branded Medicines on at least three pharmacy-to-pharmacy Platforms: (1) www.RxWorld.com ("RxWorld"); (2) www.Rxeed.com ("Rxeed"); and (3) www.MatchRx.com ("MatchRx"). Numerous other Platforms exist.

73. Each Platform operates an online marketplace that is open only to member pharmacies, which must provide proof of pharmacy licensure to gain membership. Member pharmacies can post sales offers for prescription medicines, including Lilly-Branded Medicines, which other member pharmacies can buy. The Platforms charge a percentage of the sales price as a fee.

74. Because these posts and sales transactions are only accessible to member pharmacies, they are invisible to manufacturers like Lilly, as well as regulators and law enforcement.

75. Most Platforms do not permit buyers to see the name of the pharmacy seller until a transaction is complete. This avoids direct communications between buyer and seller and ensures that the Platforms receive a cut of the profits. It also makes it impossible for anyone, even a member pharmacist, to see the total quantity of product an individual seller has sold through a particular Platform (other than the Platform operators themselves).

76. Other civil and criminal cases filed in this District and the Southern District of New York have identified counterfeiting and diversion rings whose members illegally purchase

and collect prescription drugs from patients and distribute those black-market medicines to pharmacies, which then sell those illicit medicines on pharmacy-to-pharmacy Platforms. For example, in 2024 two individual defendants pled guilty to criminal charges brought in the Southern District of New York to "selling diverted black-market medicine through online prescription drug marketplaces" worth "approximately $9 million," using pharmacies they controlled to sell to other pharmacies on the Platforms. *United States v. Aminov*, 1:23-cr-110 (S.D.N.Y.). And another pharmaceutical manufacturer has filed multiple civil Lanham Act cases in this District against defendants in New York, New Jersey, and Florida who engaged in large-scale, coordinated purchasing and collecting of already-dispensed medicines from patients, removed patient labeling from those medicines, and then sold them to pharmacies, including through pharmacy-to-pharmacy Platforms. *Gilead Sciences, Inc. v. Safe Chain Solutions, LLC,* 21-cv-4106 (E.D.N.Y.); *Gilead Sciences, Inc. v. Khaim*, 24-cv-4259 (E.D.N.Y.); *Gilead Sciences, Inc. et al. v. Pain Relief Rx, Inc. et al.*, No. 26-cv-2172 (E.D.N.Y.).

## E. DEFENDANTS' SALE OF COUNTERFEIT, DIVERTED, AND INFRINGING MEDICINES

### 1. The Instant Rx Defendants

#### a. The Instant Rx Defendants' Sale of Infringing Trulicity® Sourced from a Charitable Program

77. Instant Rx is a pharmacy located in Glendale, New York. Aulov, its principal, registered Instant Rx with Centers for Medicare and Medicaid Services ("CMS") in early 2024.

78. In late August 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed, a pharmacy-to-pharmacy Platform. Among the offerings was a package of Trulicity® advertised for $730, at the time representing a 26% discount off WAC.

79. The online "Product Details," shown below, provide that the package is "full," and in its "Sealed Original Container." The manufacturer is listed as Lilly's Dutch affiliate company. The cooperating pharmacist purchased that package.

**Products Details**

**Trulicity Subcutaneous Injection, solution**

| | |
|---|---|
| NDC Number | 00002-1434-80 |
| Strength | 1.5 MG |
| Dosage | Injection, solution |
| Manufacturer | Eli Lilly Nederland B.V. |
| Pack Size | 4 |
| Price | 730 |
| Expiration Date | 12-25 |
| Quantity in Stock | 1 |
| Lot# | D756265A |
| Pack Quantity | full |
| Package Condition | Sealed Original Container |
| Is Fridge Item | Yes |

80. Although the seller of the package of Trulicity® was not identified, the site did reveal that the seller was offering over **300** additional medicines on Rxeed at that time.

81. When the package of Trulicity® arrived, the accompanying invoice revealed that Instant Rx was the seller. Contrary to Instant Rx's advertising on the Platform, the Trulicity® delivered was U.S. product manufactured by Lilly, not its Dutch affiliate.

82. Lilly searched its internal records for the lot number and serial number of the Trulicity® sold by Instant Rx. Those records showed that the unit of Trulicity® – as shown by that unit's unique serial number – had been dispensed to a patient in April 2025 through the Lilly Cares® Foundation, a nonprofit charitable foundation.

83. The Lilly Cares® Foundation program is a free-medicine program through which the Lilly Cares® Foundation provides Lilly-Branded Medicines to patients in need for no cost. Patients who receive medicines through this program receive their medicines by delivery directly to their door or to their doctor's offices for them to pick up. Medicines dispensed through the Lilly Cares® Foundation program are *not* delivered to retail pharmacies.

84. In other words, the medicine Instant Rx sold had already been dispensed directly, for free, to a patient in need through a charitable foundation, but was resold by Instant Rx as though it were a new product four months later.

85. The cooperating pharmacist requested pedigree information from Instant Rx, but despite numerous follow-up attempts, Instant Rx did not provide it.

86. As set forth below, the product sold by Instant Rx is materially different from authentic Lilly-Branded Medicine and undermines Lilly's quality controls.

**b. Additional Facts Demonstrate the Fraudulent Nature of Instant Rx's Business**

87. Instant Rx is not a legitimate retail pharmacy. Its sole retail location has been closed since early 2025. In other words, Instant Rx shuttered its physical location *before* it sold the infringing Trulicity® to the cooperating pharmacist in August 2025. Instant Rx's sole operation appears to be the illegal sale of prescription drugs through online black markets.

88. Moreover, Instant Rx's supervising pharmacist, Johnson, is licensed in both New York and Florida, but lives in Fort Lauderdale. Under New York law, supervising pharmacists must be on-site, full-time employees of the pharmacy.

### 2. The Ira's Discount Pharmacy Defendants

#### a. Ira's Discount Pharmacy's Sells Trulicity® with an Incorrect Invoice and Pedigree

89. Two entities located in the same Palm Beach County, Florida strip mall do business as Ira's Discount Pharmacy: DPC and Sofko.

90. Drogaris founded DPC in 2004 and Sofko in 2009. He registered each with the CMS. Both Ira's Discount Pharmacy locations are only a few paces from each other in the same shopping center.

91. Drogaris controls Ira's Discount Pharmacy from his home in Staten Island, New York. Panagakos resides in Florida and runs Ira's Discount Pharmacy's day-to-day operations.

92. In July 2025, a pharmacist cooperating with Lilly logged on to RxWorld and reviewed the Trulicity® then available. Two purportedly new, authentic packages of Trulicity® were on offer at a discount, one for $865, expiring February 2026, and one for $870, expiring January 2026, at the time representing an approximately 12% discount off WAC. Although the selling pharmacy's identity was not revealed on RxWorld, reviewing the "same seller products" tab showed the same pharmacy had listed both packages of Trulicity® and had a host of other medicines for sale at steep discounts.

93. The cooperating pharmacist purchased one of the boxes of Trulicity® listed on RxWorld, and Ira's Discount Pharmacy delivered the medicine.

94. When the Trulicity® arrived, there was a mismatch between the lot number, serial number, and expiration date written on the invoice—D742742A, 326214555622, and January 2026—and the lot number, serial number, and expiration date on the actual package—2100526A, 344377870214, and April 28, 2026.







95. The cooperating pharmacist contacted Ira's Discount Pharmacy and requested a pedigree for the medicine.

96. Panagakos responded and sent the purported pedigree by email. The purported pedigree did not identify the box of Trulicity® by lot or serial number, but purported to show a chain of custody reflecting a sale from Lilly to an authorized distributor, followed by a sale from that authorized distributor to Ira's Discount Pharmacy.

97. This purported pedigree did not match the product that Ira's Discount Pharmacy shipped to the cooperating pharmacist. Lilly's internal records confirm that Lilly did *not* sell this unit of Trulicity® to the authorized distributor stated on the pedigree. Rather, Lilly sold this Trulicity® to a different authorized distributor.

**b. Ira's Discount Pharmacy Sells Large Volumes of Lilly-Branded Medicine on the Platforms Including Product Previously Dispensed to a Patient**

98. Data from two Platforms—RxWorld and MatchRx—confirms that Ira's Discount Pharmacy sells a high volume of Lilly-Branded Medicines on the Platforms. Between 2021 and 2025, Ira's Discount Pharmacy sold over 500 boxes of Lilly-Branded Medicine on those two Platforms alone. The vast majority of these sales were of Trulicity® and Mounjaro®. For each

of these sales on RxWorld and MatchRx, Ira's Discount Pharmacy sold the products at a price below WAC.

99. Numerous entries in the RxWorld and MatchRx data reflect sales from Ira's Discount Pharmacy to pharmacies in this District, with the latest such sale occurring just days before RxWorld provided data to counsel for Lilly.

100. Only a handful of the records in the data from RxWorld and MatchRx provided the serial number for the Lilly-branded medicines sold by Ira's Discount Pharmacy.

101. Lilly traced one such box of Trulicity®, with serial number 016948322452, which Lilly had sold to an authorized distributor, and that authorized distributor then sold to an independent pharmacy in Alabama.

102. An investigator working on behalf of Lilly contacted the Alabama pharmacy, which confirmed that it only has dispensed Trulicity® to patients and never has sold, or otherwise transferred, Trulicity® to another pharmacy.

103. And yet Ira's Discount Pharmacy subsequently sold on MatchRx that same box of Trulicity®, with the same unique serial number, which had been dispensed to a patient in Alabama. And that is just one example of the hundreds of below-WAC sales of Lilly-branded medicine that Ira's Discount Pharmacy made on various Platforms.

104. As set forth below, the product sold by Ira's Discount Pharmacy is materially different from authentic Lilly-Branded Medicines and undermines Lilly's quality controls.

**c. Additional Facts Demonstrate the Fraudulent Nature of Instant Rx's Business**

105. From June 2021 through April 2022, Drogaris and Panagakos operated a licensed pharmaceutical wholesale company named Delray Wholesale LLC, run from the same shopping complex and immediately adjacent to Sofko. Drogaris and Panagakos likely decided it was more

profitable to use their two pharmacies to act as unlicensed wholesalers, selling black-market Lilly-Branded Medicines and other prescription drugs through the online pharmacy-to-pharmacy Platforms, and therefore shuttered Delray Wholesale LLC.

106. Selling infringing Lilly-Branded Medicines is not the only way in which the Ira's Discount Pharmacy Defendants have profiteered at the expense of vulnerable patients. In 2012, a New York-based non-profit health insurer sued DPC for fraudulent billing between 2006 and 2009. DPC was alleged to have submitted false claims for brand name drugs while dispensing generics or no drugs at all. The case settled in 2013.

107. Drogaris and Panagakos own, serve as officers of, and/or are otherwise associated with a complex web of corporate entities that either operate in the pharmaceutical distribution industry or hold property on behalf of Drogaris and Panagakos. Discovery will show that the Ira's Discount Pharmacy Defendants use these entities to facilitate their infringing activities and/or launder the proceeds thereof.

**3. The Glen Cove Drugs Defendants**

108. Glen Cove Drugs is a retail pharmacy in Glen Cove, New York. Pinkhasou incorporated Glen Cove Drugs in 2023 and registered with CMS that year, listing himself as the pharmacy's president. In February 2025, Glen Cove Drugs replaced Pinkhasou with Sezanayev as the president in its CMS registration documents.

109. In 2018, Sezanayev posted to his Facebook page that "[s]urviving in New York [r]equires like 2 jobs and a little fraud on the side."




110. In August 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed, a pharmacy-to-pharmacy Platform. Among the offerings was a package of Trulicity® advertised for $650, at the time representing a 34% discount off WAC. While the selling pharmacy remained hidden, the cooperating pharmacist could see that the same seller had more than 10 other packages of Trulicity® for sale on Rxeed at the time.

111. The cooperating pharmacist purchased the Trulicity® for $650. When the medicine arrived, the accompanying invoice indicated the selling pharmacy was Glen Cove Drugs.

112. In October 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed. Among the offerings was a package of Trulicity® advertised for $750, at the time representing a 24% discount off WAC. While the selling pharmacy remained hidden, the cooperating pharmacist could see that the same seller had five other packages of Trulicity® for sale on Rxeed at the time.

113. The cooperating pharmacist purchased the Trulicity® for $750. When the medicine arrived, the accompanying invoice indicated the selling pharmacy was again Glen Cove Drugs.

114. As shown in the image below, the carton of medicine arrived damaged and with a shiny residue visible on the package. Such residue often indicates the use of a solvent to remove a patient label without ripping the package.







115. In November 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed. Among the offerings was a package of Trulicity® advertised for $699, at the time representing a 29% discount off WAC. While the selling pharmacy remained hidden, the cooperating pharmacist could see that the same seller had more than **500** other medicines for sale on Rxeed at the time.

116. The cooperating pharmacist purchased the Trulicity® for $699. When the medicine arrived, the accompanying invoice indicated the selling pharmacy was Glen Cove Drugs.

117. As shown in the image below, the medicine's package arrived badly damaged. It was bent, pieces of the package's outer layer were torn off, and there were spots of sticky residue on the package, indicating the removal of a pharmacy-applied patient label.




118. The cooperating pharmacist requested pedigree information from Glen Cove Drugs, but despite numerous follow-up attempts, Glen Cove Drugs did not provide it.

119. As set forth below, the product sold by Glen Cove Drugs is materially different from authentic Lilly-Branded Medicines and undermines Lilly's quality controls.

### 4. The Elite Pharmacy Defendants

120. Elite Pharmacy is a retail pharmacy in Philadelphia, Pennsylvania that is owned and operated by Berezhinsky. Berezhinsky registered the pharmacy with CMS in 2016.

#### a. The Elite Pharmacy Defendants' Sale of Multiple Infringing Medicines

121. In October 2025, a cooperating pharmacist searched RxWorld for Trulicity®. Among the packages available was one listed for $880, at the time representing an 11% discount off WAC. While the cooperating pharmacist could not see the identity of the selling pharmacy, a review of the other products available from the same seller revealed **hundreds** of other offerings at steep discounts.

122. The cooperating pharmacist purchased the Trulicity® and Elite Pharmacy delivered it to a location in the Eastern District of New York.

123. As shown in the pictures below, the outer packaging of the Trulicity® sold by Elite Pharmacy was damaged and bore markings from what appears to be a large red permanent marker.






124. Pharmacists often use a red marker to show that they have checked a medicine before dispensing it to a patient.[1] The red mark here and damage to the package indicate that this Trulicity® had already been dispensed to a patient before Elite Pharmacy re-sold it as new on RxWorld.

125. A few weeks later, also in October 2025, the cooperating pharmacist again searched RxWorld for Trulicity®, and purchased a package for $880, at the time representing an approximately 11% discount off WAC. That package was also shipped by Elite Pharmacy to a location in the Eastern District of New York.

126. When the medicine arrived, the invoice revealed Elite Pharmacy as the seller.

127. On this second package of Trulicity® from Elite Pharmacy, the area left blank for patient labeling had a significant amount of sticky residue and small areas where bits of the outer packaging had been ripped off, consistent with the removal of a pharmacy patient label, as visible in the images below.

[1] *See* https://www.drugtopics.com/view/red-pen-rules-how-prevent-pharmacy-error.





128. The cooperating pharmacist asked for pedigree information for both packages of Trulicity® from Elite Pharmacy, but despite repeated follow-up attempts, Elite Pharmacy refused to provide the information.

129. As set forth below, the product sold by Elite Pharmacy is materially different from authentic Lilly-Branded Medicines and undermines Lilly's quality controls.

**b. The Elite Pharmacy Defendants' Connections to Other Healthcare Fraud**

130. Each of the individual Elite Pharmacy Defendants has connections to additional healthcare fraud.

131. Both Berezhinsky and Litvan have ties to two Philadelphia-based pharmacies, JJ Pharmacy, Inc. and Future Pharmacy, Inc., which the government alleged billed Medicare for prescription medications that were not actually dispensed. In 2023, the government settled with the pharmacies and their owners for $3.5 million.

132. For her part, before working for Elite Pharmacy, Tolis served as the supervising pharmacist for Haussemann's Pharmacy in Philadelphia, Pennsylvania. In July 2025, the Pennsylvania Attorney General charged Haussemann's Pharmacy for purchasing HIV medications from illegitimate wholesalers and then dispensing those medications to patients as if they were legitimate.

### 5. The Atlas Drug Defendants

#### a. Atlas Drug's Sale of Infringing Medicines

133. Atlas Drug is a retail pharmacy located in Wyckoff, New Jersey. It is owned and operated by Marcos through his company, T&F.

134. In October 2025, a cooperating pharmacist logged on to Rxeed and searched for Mounjaro®. The pharmacist found a package for sale for only $349, at the time representing a 68% discount off WAC.

135. As shown in the image below, the "Package Quantity" was listed as "partial[,] Open Original Bottle / Torn or label residue" and the "Partial Quantity" as "2." The manufacturer is listed as Lilly's Dutch affiliate company.

**Products Details**

**Mounjaro Subcutaneous Injection, solution**

| | |
|---|---|
| NDC Number | 00002-1457-80 |
| Strength | 15 MG |
| Dosage | Injection, solution |
| Manufacturer | Eli Lilly Nederland B.V. |
| Pack Size | 4 |
| Price | 349 |
| Expiration Date | 03-27 |
| Quantity in Stock | 1 |
| Lot# | D836364D |
| Pack Quantity | partial |
| Package Condition | Open Original bottle/ Torn or label residue |
| Is Fridge Item | Yes |
| Partial Quantity | 2 |

136. The cooperating pharmacist purchased the Mounjaro® described above. It was shipped by Atlas Drug to a location in the Eastern District of New York. Contrary to Atlas Drug's advertising on the Platform, the Mounjaro® delivered was U.S. product manufactured by Lilly, not its Dutch affiliate.

137. When the Mounjaro® arrived, the package showed clear signs of having already been dispensed to a patient and opened. In addition to extensive wear on the outer packaging, the remnants of the former patient label were clearly visible on the package, with portions of words and barcodes from that patient label still visible, as shown in the image below.




138. In addition, the package contained only two of the four doses that appear in a new authentic package of Mounjaro®.

139. The package was also missing the Patient Information Documents, *i.e.*, the FDA-mandated prescribing information and instructions for use that are included in every legitimate, complete package of Mounjaro®.

140. As a matter of patient safety and quality controls, Lilly would never permit an opened package of Mounjaro®, containing less than the full number of doses and without information critical to patients, to enter the U.S. pharmaceutical supply chain or be dispensed to a patient.

141. The cooperating pharmacist repeatedly sought pedigree information from Atlas Drug, but despite repeated follow-ups, Atlas Drug refused to provide it.

142. As set forth below, the product sold by Atlas Drug is materially different from authentic Lilly-Branded Medicines and undermines Lilly's quality controls.

**b. Additional Facts Demonstrating the Fraudulent Nature of Atlas Drug's Business**

143. Marcos is the president, sole officer, and supervising pharmacist of T&F and its Atlas Drug location.

144. Marcos is also a convicted felon. In June 2010, Marcos pled guilty to healthcare fraud charges brought by the United States Attorney's Office for the District of New Jersey. Marcos admitted to operating a retail pharmacy in New Jersey named Sicomac Pharmacy, through which he submitted hundreds of claims to the Federal Employees Health Benefits Program for patients that had not requested nor received the medicines for which Marcos sought payment.

145. Sicomac Pharmacy is now part of T&F, through which Marcos also owns and operates Atlas Drug.

146. As a result of his guilty plea, Marcos lost his pharmacy license. In April 2014, Marcos successfully petitioned for reinstatement of his license in part. As part of the petition, Marcos stated that he had learned "to stay within the confines of the law" and to never "do anything that isn't correct and moral and ethical." New Jersey reinstated Marcos's license in 2017.

**F. THE DEFENDANTS SOLD INAUTHENTIC LILLY-BRANDED MEDICINES THAT HAD BEEN REPURCHASED FROM PATIENTS**

147. The below-WAC pricing, removed prior patient labelling, mismatched invoices, mismatched or missing pedigrees, missing Patient Information Documents, and damaged and opened outer packaging are all signs that the Lilly-Branded Medicines sold by the Defendants had been previously dispensed to a patient, were illegally purchased back from that patient, and then were fraudulently re-sold as new on a pharmacy-to-pharmacy Platform.

148. Authentic Lilly-Branded Medicines are new, never-dispensed products that are distributed and dispensed through the highly regulated legitimate U.S. supply chain, pursuant to both federal law and Lilly's own policies and procedures. Lilly-Branded Medicines that have been previously dispensed and then resold as new are materially different from authentic Lilly-Branded Medicines.

149. Pharmacies and patients associate Lilly's trademarks, including the brand names of Lilly-Branded Medicines, with Lilly's history of providing high-quality medicine through a safe and secure supply chain.

150. Any U.S. patient with a prescription for a Lilly-Branded Medicine is entitled to receive a new, authentic package of that medicine. If given a choice between (1) new, authentic Lilly-Branded Medicine and (2) medicine that had been dispensed to a different patient by a different pharmacy, then purchased back from that patient and resold on the black market, no rational patient would willingly choose the latter.

151. In reality, patients are given no choice: the Defendants sell inauthentic Lilly-Branded Medicines on the black market as part of a scheme to conceal the illicit nature of the drugs they sell, so they can be foisted on innocent patients. The patients are put at risk, while all the illicit profits go to the pharmacies and their co-conspirators.

152. The Lilly-Branded Medicines sold by the Defendants also undermine Lilly's quality control standards and procedures. Lilly would never allow medicine that was already dispensed to a patient to be resold and consumed, or permit a pharmacy to remove a prior patient label in order to cause medicine to appear new.

153. Lilly's strict quality-control standards would never allow Lilly-Branded Medicine to be held by a layperson patient for an unknown period of time under unknown conditions

before being unlawfully resold and reintroduced back into the supply chain. The threat to patient health posed by this illegal practice is especially apparent for products like Trulicity® and Mounjaro®, which are cold-chain products.

154. Indeed, for cold-chain products like Trulicity® and Mounjaro®, Lilly employs strict quality-control procedures, described above, to ensure the product remains stored at the proper temperature throughout the supply chain, and that any deviation from the proper temperature results in immediate return or quarantine of the product. It is of course a violation of Lilly's temperature-related quality-control procedures (among others) to have a cold-chain product held by a patient for an unknown period in unknown conditions, and then illegally purchased back from that patient to be resold.

155. Moreover, and separately, the Defendants' own pharmacy-to-pharmacy shipments violate and undermine Lilly's temperature-related quality-control procedures. Even if the Lilly-Branded Medicines shipped by these pharmacies were not black-market medicines purchased off the streets, the shipping containers and shipping methods utilized by the Defendants do not comply with Lilly's strict guidelines and offer no means for monitoring or quarantining products in case of temperature deviations.

156. The Defendants' sale of Lilly-Branded Medicines also undermines Lilly's quality-control procedures by trafficking the medicines through walled-off pharmacy-to-pharmacy Platforms, which are designed to prevent any monitoring of the sales of their products by manufacturers, law enforcement, or anyone else. The Defendants also conceal the black-market source of their medications by using missing, inaccurate, or counterfeit documentation, including invoices, pedigrees, and transactional information. All of this has the intended effect of

preventing or hindering Lilly's ability to trace the origins of suspect product and perform quality-control investigations.

157. By selling inauthentic, previously dispensed Lilly-Branded Medicines from and to pharmacies in this District, and to an untold number of additional pharmacies throughout the United States, the Defendants are putting patients at risk to turn an illicit profit. They must be stopped immediately.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))
### (Against all Defendants)

158. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

159. In violation of 15 U.S.C. § 1114(1)(a), the Defendants, independently and in conspiracy with one another, used in U.S. commerce, without Lilly's consent, either a reproduction, counterfeit, copy, or colorable imitation of the Lilly Marks in connection with the sale, offering for sale, distribution, or advertising of (A) counterfeit Lilly-Branded Medicines; (B) Lilly-Branded Medicines (i) with altered, falsified, mismatched, and/or nonexistent pedigrees, (ii) with damaged or opened packaging, (iii) including only partial doses, (iv) sold with paperwork including inaccurate lot numbers, serial numbers, and/or expiration dates, (v) stored at improper temperatures and/or shipped in violation of Lilly's quality-control procedures; (vi) missing FDA-mandated Patient Information Documents; and/or (vii) that were previously dispensed to patients, repurchased, and resold into the supply chain as if they were new; (C) Lilly-Branded Medicines that are otherwise materially different from authentic Lilly-Branded

Medicines authorized for sale by Lilly in the United States; and (D) Lilly-Branded Medicines that are otherwise not subject to and/or subvert Lilly's quality-control measures.

160. The Defendants' actions are likely to cause confusion or mistake, or to deceive.

161. The Defendants' actions constitute infringement of Lilly's exclusive rights in the Lilly Marks and Lilly Trade Dress. The Defendants acted intentionally and willfully in violating Lilly's exclusive rights in the Lilly Marks.

162. The Defendants are directly, contributorily, and vicariously liable for their infringement.

163. As a direct and proximate result of the Defendants' conduct, Lilly has suffered irreparable harm to the valuable Lilly Marks and their reputation in the industry. Unless the Defendants are restrained from further infringement of the Lilly Marks, Lilly will continue to be irreparably harmed.

164. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

165. As a direct and proximate result of the Defendants' conduct, Lilly has suffered damages to the valuable Lilly Marks and other damages in an amount to be proved at trial.

**SECOND CLAIM FOR RELIEF**
**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))**
**(Against all Defendants)**

166. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

167. In violation of 15 U.S.C. § 1114(1)(b), the Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Lilly Marks and applied such reproduction, counterfeit, copy or colorable imitation to

labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of (A) counterfeit Lilly-Branded Medicines; (B) Lilly-Branded Medicines (i) with altered, falsified, mismatched, and/or nonexistent pedigrees, (ii) with damaged or opened packaging, (iii) including only partial doses, (iv) sold with paperwork including inaccurate lot numbers, serial numbers, and/or expiration dates, (v) stored at improper temperatures and/or shipped in violation of Lilly's quality-control procedures; (vi) missing FDA-mandated Patient Information Documents; and/or (vii) that were previously dispensed to patients, repurchased, and resold into the supply chain as if they were new; (C) Lilly-Branded Medicines that are otherwise materially different from authentic Lilly-Branded Medicines authorized for sale by Lilly in the United States; and (D) Lilly-Branded Medicines that are otherwise not subject to and/or subvert Lilly's quality-control measures.

168. The Defendants' actions are likely to cause confusion or mistake, or to deceive.

169. For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Lilly Marks in advertising the black-market products and on invoices.

170. The Defendants' actions constitute infringement of Lilly's exclusive rights in the Lilly Marks and Lilly Trade Dress. The Defendants acted intentionally and willfully in violating Lilly's exclusive rights in the Lilly Marks.

171. The Defendants are directly, contributorily, and vicariously liable for their infringement.

172. As a direct and proximate result of the Defendants' conduct, Lilly has suffered irreparable harm to the valuable Lilly Marks and its reputation in the industry. Unless the

Defendants are restrained from further infringement of the Lilly Marks and Trade Dress, Lilly will continue to be irreparably harmed.

173. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

174. As a direct and proximate result of the Defendants' conduct, Lilly has suffered damages to the valuable Lilly Marks and other damages in an amount to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE**
**(15 U.S.C. § 1125(A)**
**(Against all Defendants)**

175. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

176. In violation of 15 U.S.C. § 1125(a)(1)(A), the Defendants used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Lilly.

177. For example and without limitation, the Defendants used the Lilly Trade Marks and Lilly Trade Dress in connection with the sale, distribution, and advertising (A) Lilly-Branded Medicines (i) with altered, falsified, mismatched, and/or nonexistent pedigrees, (ii) with damaged or opened packaging, (iii) including only partial doses, (iv) sold with paperwork including inaccurate lot numbers, serial numbers, and/or expiration dates, (v) stored at improper temperatures and/or shipped in violation of Lilly's quality-control procedures; (vi) missing FDA-mandated Patient Information Documents; and/or (vii) that were previously dispensed to patients, repurchased, and resold into the supply chain as if they were new; (B) Lilly-Branded

Medicines that are otherwise materially different from authentic Lilly-Branded Medicines authorized for sale by Lilly in the United States; and (C) Lilly-Branded Medicines that are otherwise not subject to and/or subvert Lilly's quality-control measures.

178. The Defendants' actions are likely to cause confusion or mistake, or to deceive.

179. The Defendants' actions constitute infringement of Lilly's exclusive rights in the Lilly Marks and Lilly Trade Dress. The Defendants acted intentionally and willfully in violating Lilly's exclusive rights in the Lilly Marks and Lilly Trade Dress.

180. The Defendants are directly, contributorily, and vicariously liable for their infringement.

181. As a direct and proximate result of the Defendants' conduct, Lilly has suffered irreparable harm to the valuable Lilly Marks and Lilly Trade Dress and their reputation in the industry. Unless the Defendants are restrained from further infringement of the Lilly Marks and Lilly Trade Dress, Lilly will continue to be irreparably harmed.

182. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

183. As a direct and proximate result of the Defendants' conduct, Lilly has suffered damages to the valuable Lilly Marks and Lilly Trade Dress and other damages in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**FEDERAL FALSE ADVERTISING**
**(Against all Defendants)**

184. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

185. In violation of 15 U.S.C. § 1125(a)(1)(B), the Defendants, independently and in conspiracy with one another, Defendants used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the Lilly-Branded Medicine they sold.

186. Among other things, the Defendants falsely advertised as new, authentic product Lilly-Branded Medicines that in reality were products that had already been dispensed to patients, held under unknown conditions for an unknown period of time by those patients, and then repurchased on the black market.

187. The Defendants advertised, marketed, and promoted counterfeit and diverted Lilly-Branded Medicines to the public, and/or to specific segments of the public, using the Lilly Marks and Lilly Trade Dress, as well as other intellectual property belonging to Lilly.

188. The Defendants' actions are likely to cause confusion or mistake, or to deceive.

189. The Defendants are directly, contributorily, and vicariously liable for their infringement.

190. As a direct and proximate result of the Defendants' conduct, Lilly has suffered irreparable harm to its goodwill and reputation in the industry. Unless the Defendants' conduct is restrained, Lilly will continue to be irreparably harmed.

191. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

192. As a direct and proximate result of the Defendants' conduct, Lilly has suffered damages in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**NEW YORK DECEPTIVE BUSINESS PRACTICES**
**(Against all Defendants)**

193. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

194. In violation of New York General Business Law § 349, the Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or distributing (A) counterfeit Lilly-Branded Medicines; (B) Lilly-Branded Medicines (i) with altered, falsified, mismatched, and/or nonexistent pedigrees, (ii) with damaged or opened packaging, (iii) including only partial doses, (iv) sold with paperwork including inaccurate lot numbers, serial numbers, and/or expiration dates, (v) stored at improper temperatures, (vi) missing FDA-mandated Patient Information Documents; and/or (vii) that were previously dispensed to patients, repurchased, and resold into the supply chain as if they were new; (C) Lilly-Branded Medicines that are materially different from authentic Lilly-Branded Medicines authorized for sale by Lilly in the United States; and (D) Lilly-Branded Medicines that are not subject to and subvert Lilly's quality-control measures, each of which unlawfully bear Lilly's Marks and Lilly's Trade Dress.

195. As a direct and proximate result of the Defendants' deceptive conduct, Lilly has suffered irreparable harm to the valuable Lilly Marks and Lilly Trade Dress and their reputation in the industry. Unless the Defendants are restrained from further infringement of the Lilly Marks and Lilly Trade Dress, Lilly will continue to be irreparably harmed.

196. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

**SIXTH CLAIM FOR RELIEF**
**<u>COMMON-LAW UNFAIR COMPETITION</u>**
**(Against all Defendants)**

197. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

198. In violation of the common law of the State of New York and elsewhere, the Defendants, independently and in conspiracy with one another, have unfairly competed with Lilly by selling the counterfeit, altered, and/or falsified products.

199. As a direct and proximate result of the Defendants' unfair competition, Lilly has suffered irreparable harm to the valuable Lilly Marks and Lilly Trade Dress and their reputation in the industry. Unless the Defendants' conduct is restrained, Lilly will continue to be irreparably harmed.

200. Lilly has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Defendants' acts are allowed to continue.

201. As a direct and proximate result of the Defendants' unfair competition, Lilly has suffered damages to the valuable Lilly Marks and Lilly Trade Dress and other damages in an amount to be proved at trial.

**SEVENTH CLAIM FOR RELIEF**
**<u>COMMON-LAW UNJUST ENRICHMENT</u>**
**(Against all Defendants)**

202. Lilly realleges and incorporates by reference the paragraphs above as if fully set forth herein.

203. By selling (A) counterfeit Lilly-Branded Medicines; (B) Lilly-Branded Medicines (i) with altered, falsified, mismatched, and/or nonexistent pedigrees, (ii) with damaged or opened packaging, (iii) including only partial doses, (iv) sold with paperwork including inaccurate lot

numbers, serial numbers, and/or expiration dates, (v) stored at improper temperatures, (vi) missing FDA-mandated Patient Information Documents; and/or (vii) that were previously dispensed to patients, repurchased, and resold into the supply chain as if they were new; (C) Lilly-Branded Medicines that are materially different from authentic Lilly-Branded Medicines authorized for sale by Lilly in the United States; and (D) Lilly-Branded Medicines that are not subject to and subvert Lilly's quality-control measures, each of which unlawfully bear Lilly's Marks and Lilly's Trade Dress, the Defendants have been unjustly enriched at Lilly's expense in violation of the common law of New York and elsewhere.

204. Under principles of equity, Lilly is entitled to restitution and/or disgorgement of the Defendants' ill-gotten gains.

## **PRAYER FOR RELIEF**

WHEREFORE, Lilly demands judgment against the Defendants as follows:

A. preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

(i) from buying, selling, or dispensing any Lilly-Branded Medicine, whether genuine, infringing, or counterfeit;

(ii) from using any of the Lilly Marks and Lilly Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medicine;

(iii) from using any logo, trade name, or trademark confusingly similar to any of the Lilly Marks and Lilly Trade Dress, which may be

calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Lilly;

(iv) from directly, contributorily, and vicariously infringing any of the Lilly Marks and Lilly Trade Dress;

(v) from otherwise unfairly competing with Lilly in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Lilly-Branded Medicines;

(vi) from falsely representing themselves as being connected with Lilly or sponsored by or associated with Lilly or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that the Defendants, or any of them, are associated with Lilly;

(vii) from using any reproduction, counterfeit, copy, or colorable imitation of any of the Lilly Marks and Lilly Trade Dress in connection with the publicity, promotion, sale, or advertising of medicines;

(viii) from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being authentic Lilly-Branded Medicines and from offering such goods in commerce;

(ix) from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be Lilly medicines, including without limitation any records concerning any insurance claims or payments with regard to such products; and

(x) from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (ix) above; and

B. ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, the Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction;

C. ordering that all infringing material be turned over, seized, impounded, and/or destroyed;

D. awarding to Lilly punitive damages from each Defendant in an amount to be ascertained at trial;

E. awarding to Lilly statutory, actual damages, or threefold damages in an amount to be ascertained at trial, and costs and attorney's fees;

F. awarding to Lilly an accounting, and an award of all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the infringing and counterfeit medicine, as well as Lilly's remedial costs;

G. awarding to Lilly pre-judgment and post-judgment interest; and

H. awarding such other and further relief to Lilly as may be just, proper, and equitable.

**JURY DEMAND**

Lilly hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all claims and issues so triable.

Dated: New York, New York
June 9, 2026

PATTERSON BELKNAP WEBB & TYLER LLP

By: ______________________________

Geoffrey Potter
Timothy A. Waters
Isaac Weingram
Caroline Zielinski
Anna Petrocelli
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E: gpotter@pbwt.com
twaters@pbwt.com
iweingram@pbwt.com
czielinski@pbwt.com
apetrocelli@pbwt.com

*Attorneys for Plaintiff Eli Lilly & Company*