FILED
IN CLERK'S OFFICE
US DISTRICT COURT
*JUNE 9, 2026*
BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELI LILLY AND COMPANY, Plaintiff, v. INSTANT RX INC., *et al.*, Defendants. | Case No. 26-cv-3429<br>Judge Natasha C. Merle<br>Magistrate Judge Joseph A. Marutollo |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, EXPEDITED DISCOVERY ORDER, AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

Geoffrey Potter
Timothy A. Waters
Isaac Weingram
Caroline Zielinski
Anna Petrocelli

PATTERSON BELKNAP WEBB & TYLER LLP

*Attorneys for Plaintiff Eli Lilly and Company*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................2

STATEMENT OF FACTS ....................................................................................................4

I. LILLY'S MEDICINES .................................................................................................... 4

A. Lilly's Diabetes Medicines ....................................................................................5

B. Lilly's Secure Supply Chain and Pricing ....................................................................................5

C. Lilly's Quality-Control Standards ....................................................................................7

1. Temperature Control and Temperature Monitoring ....................................7

2. Targeted Recalls ....................................................................................8

3. Pedigrees and Chain-of-Custody Information ....................................9

4. Lilly's Packaging and Patient-Information Documentation ....................11

II. THE PHARMACY-TO-PHARMACY PLATFORMS .................................................... 12

III. CRIMINAL AND CIVIL ACTIONS INVOLVING THE PLATFORMS AND BOUGHT-BACK MEDICINES .................................................................................... 13

IV. DEFENDANTS' SALE OF INFRINGING LILLY-BRANDED MEDICINES ON PHARMACY-TO-PHARMACY PLATFORMS .................................................... 16

A. The Instant Rx Defendants ....................................................................................16

B. The Ira's Discount Pharmacy Defendants ....................................................................18

1. Ira's Discount Pharmacy Provides an Incorrect Invoice and Pedigree ....................................................................................20

2. Ira's Large-Volume Sales of Lilly Medicines on Platforms – Including a Box Previously Dispensed by Another Pharmacy ....................21

C. The Glen Cove Drugs Defendants ....................................................................23

D. The Elite Pharmacy Defendants ....................................................................26

E. The Atlas Drug Defendants ....................................................................29

**TABLE OF CONTENTS**
**(continued)**


**Page**

ARGUMENT ....................................................................................................................31

I. LILLY IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AGAINST DEFENDANTS ........................................ 31

A. This Court Has Personal Jurisdiction Over the Defendants..................................32

B. Lilly Has a Strong Likelihood of Success on the Merits .......................................33

1. Defendants Are Liable for Selling Counterfeit and Materially Different Products that Undermine Lilly's Quality-Control Procedures ...........................................................................................34

a. The Quality-Control Doctrine ......................................................34

b. The Material-Differences Doctrine ...............................................36

c. Counterfeiting ...............................................................................37

d. The First-Sale Rule Does Not Apply ............................................40

2. Consumer Confusion Is Presumed, and the Polaroid Test Does Not Apply...........................................................................................41

3. Each Defendant Is Individually Liable for Infringement..........................42

4. The Defendants Are Willful Infringers, but Lilly Needs to Establish Only Strict Liability .................................................................43

C. Lilly Is Suffering Irreparable Harm as a Result of Defendants' Activities ...........44

D. The Balance of Equities Tips Decisively in Lilly's Favor....................................45

E. An Injunction Is in the Public Interest ..................................................................45

II. LILLY IS ENTITLED TO AN ORDER FREEZING DEFENDANTS' ASSETS .......... 46

A. Legal Standard for Asset Freezes under the Lanham Act....................................46

B. Lilly Has a Strong Likelihood of Success on the Merits .......................................47

C. Defendants Are Likely to Dissipate Assets, and Lilly Will Suffer Additional Irreparable Harm If Defendants' Assets Are Not Frozen ....................48

D. The Balance of the Equities Strongly Favors Lilly...............................................49

E. The Public Interest Is Served by an Asset Freeze .................................................49

**TABLE OF CONTENTS**
**(continued)**

**Page**

F. The Asset Freeze Should Be Global in Scope ....................................................50

III. THE COURT SHOULD ISSUE THE REQUESTED INJUNCTIVE RELIEF EX PARTE ........................................................................................................ 50

IV. LILLY IS ENTITLED TO EXPEDITED DISCOVERY ............................................... 54

CONCLUSION.......................................................................................................................57

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
No. 15-CV-5826 (CBA) (MDG), 2015 WL 10906060 (E.D.N.Y. Nov. 6, 2015), *aff'd*, 670 F. App'x 6 (2d Cir. 2016) ....................40

*ALCOA, Inc. v. ATM, Inc.*,
No. 04-CV-5225 (DRH), ECF No. 9 (E.D.N.Y. Dec. 2, 2004)....................55

*Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia S.P.A.*,
678 F. Supp. 1049 (S.D.N.Y. 1987), *aff'd*, 847 F.2d 53 (2d Cir. 1988)....................56

*Am. Girl, LLC v. Zembrka*,
118 F.4th 271 (2d Cir. 2024), *cert. denied sub nom. Zembrka v. Am. Girl, LLC.*, 145 S. Ct. 1130 (2025)....................33

*AT&T Broadband v. Tech Commc'ns, Inc.*,
381 F.3d 1309 (11th Cir. 2004) ....................53

*Balenciaga Am., Inc. v. Dollinger*,
No. 10-cv-2912 (LTS), 2010 WL 3952850 (S.D.N.Y. Oct. 8, 2010)....................49, 50

*Bel Canto Design Ltd. v. MSS Hifi, Inc.*,
837 F. Supp. 2d 208 (S.D.N.Y. 2011)....................40

*Benham Jewelry Corp. v. Aron Basha Corp.*,
No. 97-CV-3841 (RWS), 1997 WL 639037 (S.D.N.Y. Oct. 14, 1997)....................55

*Burger King Corp. v. Stephens*,
No. 89-CV-7691, 1989 WL 147557 (E.D. Pa. Dec. 6, 1989)....................45

*Cartier Int'l B.V. v. Ben-Menachem*,
No. 06-CV-3917 (RWS), 2008 WL 64005 (S.D.N.Y. Jan. 3, 2008)....................55

*Chanel, Inc. v. Classic-Bag-Shop*,
No. 19-cv-60492, 2019 WL 2638608 (S.D. Fla. Mar. 14, 2019) ....................48, 52

*Chere Amie, Inc. v. Windstar Apparel Corp.*,
191 F. Supp. 2d 343 (S.D.N.Y. 2001)....................55

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)....................32

*Church of Scientology Int'l v. Elmira Mission*,
794 F.2d 38 (2d Cir. 1986)....................44

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Citronelle-Mobile Gathering, Inc. v. Watkins*,
943 F.2d 1297 (11th Cir. 1991) ....................................................................................50

*Coty Inc. v. Cosmopolitan Cosmetics Inc.*,
432 F. Supp. 3d 345 (S.D.N.Y. 2020)..............................................................37, 38, 40, 41

*Cytosport, Inc. v. Vital Pharms., Inc.*,
617 F. Supp. 2d 1051 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir 2009)...................45

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)..........................................................................................................32

*Dong v. Miller*,
No. 16-CV-5836 (NGG) (JO), 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) .......................49

*Energizer Brands, LLC v. My Battery Supplier, LLC*,
529 F. Supp. 3d 57 (E.D.N.Y. 2021) ..................................................................................40

*Fed. Express Corp. v. Fed. Espresso, Inc.*,
No. 97-CV-1219, 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997) ...........................................57

*Francis S. Denney, Inc. v. I.S. Labs., Inc.*,
737 F. Supp. 247 (S.D.N.Y. 1990) ......................................................................................56

*GAKM Res. LLC v. Jaylyn Sales, Inc.*,
No. 08-CV-6030 (GEL) (THK), 2009 U.S. Dist. LEXIS 128595 (S.D.N.Y. May 21, 2009)...............................................................................................................55

*Gidatex, S.R.L. v. Campaniello Imports, Ltd.*,
13 F. Supp. 2d 417 (S.D.N.Y. 1998)...............................................................................55, 56

*Gilead Scis. Inc., et al. v. Pain Relief Rx Inc. et al*,
No. 26-cv-02172 (E.D.N.Y.) ........................................................................................ *passim*

*Gilead Scis., Inc. v. Khaim*,
No. 24-cv-4259 (E.D.N.Y.) .......................................................................................... *passim*

*Gilead Scis., Inc. v. Meritain Health Inc.*,
No. 24-cv-03566 (JRR), 2025 WL 1745669 (D. Md. June 24, 2025) ...................................35

*Gilead Scis., Inc. v. Safe Chain Sols., LLC*,
684 F. Supp. 3d 51 (E.D.N.Y. 2023) ........................................................................... *passim*

*Gucci Am., Inc. v. Bank of China*,
768 F.3d 122 (2d Cir. 2014)...............................................................................................47

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
286 F. Supp. 2d 284 (S.D.N.Y. 2003)....42

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
955 F.2d 1143 (7th Cir. 1992) ....43

*Hoffman-La Roche, Inc. v. Medisca, Inc.*,
No. 99-CV-163, 1999 WL 123578 (N.D.N.Y. Mar. 3, 1999) ....56

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
176 F. Supp. 3d 137 (E.D.N.Y. 2016) ....42

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) ....46

*Iron Maiden Holdings Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*,
No. 1:18-cv-1098, 2018 WL 2077732 (N.D. Ill. Mar. 6, 2018) ....50

*Janssen Scis. Ireland Unlimited Co. v. TLC Xpress Pharmacy Inc.*,
No. 22-cv-1983 (BMC), 2025 WL 974299 (E.D.N.Y. Apr. 1, 2025) ....37, 39

*Johnson & Johnson Consumer Cos. v. Aini*,
540 F. Supp. 2d 374 (E.D.N.Y. 2008) ....37, 38

*Johnson & Johnson v. Champion Sales, Inc.*,
No. 06-CV-5451 (SLT), ECF No. 3 (E.D.N.Y. Oct. 7, 2006)....55

*KatiRoll Co. v. Kati Junction, Inc.*,
33 F. Supp. 3d 359 (S.D.N.Y. 2014)....42

*Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*,
192 F.3d 337 (2d Cir. 1999)....33

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
51 F.3d 982 (11th Cir. 1995) ....47

*Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*,
No. 03-cv-4844, 2005 WL 3115892 (N.D. Ill. Nov. 8, 2005) ....47, 48, 49

*Martin's Herend Imps., Inc. v. Diamond & Gem Trading USA, Co.*,
112 F.3d 1296 (5th Cir. 1997) ....41

*Matsunoki Grp., Inc. v. Timberwork Or., Inc.*,
No. 08-cv-04078 (CW), 2009 WL 1033818 (N.D. Cal. Apr. 16, 2009)....42

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Mattel, Inc. v. Procount Bus. Servs.*,
No. 03 Civ. 7234 (RWS), 2004 WL 502190 (S.D.N.Y. Mar. 10, 2004) ....33

*Microsoft Corp. v. ATEK 3000 Computer, Inc.*,
No. 06-CV-6403 (SLT)(SMG), 2008 WL 2884761 (E.D.N.Y. Jul. 23, 2008)....45

*Multi-Local Media Corp. v. 800 Yellow Book, Inc.*,
813 F. Supp. 199 (E.D.N.Y. 1993) ....31

*N. Face Apparel Corp. v. TC Fashions, Inc.*,
No. 05-cv-9083 (RMB), 2006 WL 838993 (S.D.N.Y. Mar. 30, 2006) ....47

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F. Supp. 2d 305 (S.D.N.Y 2010)....44

*Novartis Animal Health US, Inc. v. LM Connelly & Sons, Pty. Ltd*,
No. 04 Civ 10213 (BSJ), 2005 WL 1902085 (S.D.N.Y. Jun. 14, 2005) ....41

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
451 F.2d 1190 (2d Cir. 1971)....44

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
816 F.2d 68 (2d Cir. 1987)....36

*Philip Morris USA, Inc. v. Jackson*,
826 F. Supp. 2d 448 (E.D.N.Y. 2011) ....55

*Philip Morris USA Inc. v. Shalabi*,
352 F. Supp. 2d 1067 (C.D. Cal. 2004) ....43

*Playskool, Inc. v. Prod. Dev. Grp., Inc.*,
699 F. Supp. 1056 (E.D.N.Y. 1988) ....56

*Polaroid Corp. v. Polaroid Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961)....41, 42

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*,
778 F. Supp. 2d 261 (E.D.N.Y. 2011) ....44

*Prince of Peace Enters. v. Top Quality Food Mt, LLC*,
No. 07 Civ. 00349 (RJH), 2007 WL 704171 (S.D.N.Y. Mar. 7, 2007)....41

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
970 F.2d 552 (9th Cir. 1992) ....48, 52

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Shamrock Power Sales, LLC v. Scherer*,
No. 12-cv-8959 (KMK)(JCM), 2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016) ....................47

*Shell Oil Co. v. Com. Petroleum, Inc.*,
928 F.2d 104 (4th Cir. 1991) ....................41

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
982 F.2d 633 (1st Cir. 1992)....................38, 41

*Standard & Poor's Corp. v. Commodity Exch., Inc.*,
683 F.2d 704 (2d Cir. 1982)....................50

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004)....................43

*Taubman Co. v. Webfeats*,
319 F.3d 770 (6th Cir. 2003) ....................43

*Threeline Imports, Inc. v. Vernikov*,
239 F. Supp. 3d 542 (E.D.N.Y. 2017) ....................33

*Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*,
924 F. Supp. 17 (S.D.N.Y. 1996) ....................56

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*,
749 F. Supp. 473 (S.D.N.Y. 1990) ....................55, 56

*United States v. Aminov*,
1:23-cr-110 (S.D.N.Y.) ....................14, 16

*United States v. First Nat'l City Bank*,
379 U.S. 378 (1965)....................2, 33, 50

*In re Vuitton et Fils S.A.*,
606 F.2d 1 (2d Cir. 1979)....................54

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*,
106 F.3d 894 (9th Cir. 1997) ....................39

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................32

*Zino Davidoff SA v. CVS Corp.*,
571 F.3d 238 (2d Cir. 2009)....................34, 35, 36, 37

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Statutes**

15 U.S.C. § 1114 ... 37

15 U.S.C. § 1116 ... 44

15 U.S.C. § 1117 ... *passim*

18 U.S.C. § 2320 ... 51

21 U.S.C. § 331 ... 51

21 U.S.C. § 333 ... 51

28 U.S.C. § 1657 ... 54

Drug Supply Chain Security Act, 21 U.S.C. § 360eee *et seq.* ... *passim*

N.Y. Educ. Law § 6808(2)(e) ... 23

**Other Authorities**

1984 U.S.C.C.A.N. ... 53

Federal Rules of Civil Procedure Rule 26 ... 54

Federal Rules of Civil Procedure Rule 30 ... 55

Federal Rules of Civil Procedure Rule 34 ... 55

Federal Rules of Civil Procedure Rule 65 ... 50, 51, 53

Local Civil Rule 7.1 ... 59

Plaintiff Eli Lilly and Company ("Lilly" or "Plaintiff") submits this memorandum of law in support of its application seeking immediate injunctive relief.

Lilly requests an *ex parte* asset freeze order, temporary restraining order (to be followed by a preliminary injunction), and expedited discovery order against all Defendants:

A. Instant Rx Inc. ("Instant Rx"), its principal David Aulov, and its supervising pharmacist Thomas Johnson (collectively, the "Instant Rx Defendants");

B. Dispensing Physician Consultants, Inc. d/b/a Ira's Discount Pharmacy, Sofko LLC d/b/a Ira's Discount Pharmacy and also d/b/a Total Care Pharmacy (collectively, "Ira's Discount Pharmacy"), and the principals of Ira's Discount Pharmacy, George Drogaris a/k/a George Drograris ("Drogaris"); Prokopios Panagakos, also known as Koko, Panagakos Procopios, and Procopios Panagakos ("Panagakos"); and supervising pharmacists Sue A. Pepper and Mirjana Tasic-Pantic (collectively with Ira's Discount Pharmacy, the "Ira's Discount Pharmacy Defendants");

C. Glen Cove Drugs Inc. ("Glen Cove Drugs"), its principals Simeon Pinkhasou and Yuriel Sezanayev, and its supervising pharmacist Halima Syed (collectively, the "Glen Cove Drugs Defendants");

D. Lalibela, Ltd d/b/a Elite Pharmacy ("Elite Pharmacy") and its principals Yakov Berezhinsky and Yuriy Litvan, and its supervising pharmacist Christina Tolis (collectively, the "Elite Pharmacy Defendants");

E. T & F Drugs Inc. d/b/a Atlas Drug & Nutrition ("Atlas Drug") and its principal and supervising pharmacist, Francisco Marcos (together, the "Atlas Drug Defendants").

## INTRODUCTION

Lilly brings this action to immediately halt a dangerous prescription drug diversion and counterfeiting scheme that is operating up and down the east coast of the United States. The evidence shows that the Defendants all operate the same scheme. First, the Defendants or their co-conspirators prey on vulnerable patients who have been validly dispensed Lilly-branded medicines for low or no cost, and convince them to sell their medicine on the black market for cash. Second, the Defendants or their co-conspirators collect these already-dispensed, illegally street-purchased medicines and alter them to look like new, including by using chemicals to remove patient labels from the medicines' packaging. Third, the Defendants sell these altered, now-infringing medicines as though they are new, authentic Lilly products to other pharmacies via online "pharmacy-to-pharmacy" platforms (the "Platforms").

These Platforms are, by design, invisible to manufacturers like Lilly (and to law enforcement), and they operate as the perfect *de facto* internet black market for the Defendants to sell their illegal goods. The purchasing pharmacies dispense these black-market medicines to their patients, who pay full price for the medicine and have every reason to believe they have received a box of new, authentic, safely distributed Lilly-branded medicine, which has been subject to Lilly's strict quality-control standards. Instead, the patients have received altered, inauthentic, and potentially dangerous medicine that, if it had actually been subject to Lilly's quality-control standards, would never have been allowed into a patient's hands.

This is a large-scale scheme, putting untold numbers of patients at risk. The Defendants are all retail pharmacies, at least in name, but the Platforms allow them to act as unlicensed pharmaceutical wholesalers. The Defendants pretend to sell their own overstocked medicine to fulfill a "specific patient need." In reality, the evidence shows, and discovery will further confirm, that the Defendants sell wholesale levels of infringing and counterfeit Lilly-branded medicines in

violation of Lilly's trademark rights and numerous state and federal laws. And as discussed below, other individuals and pharmacies have been successfully criminally prosecuted and civilly enjoined in the Southern and Eastern Districts of New York for their roles in similar schemes involving the same type of online pharmacy-to-pharmacy Platforms.

The danger this scheme poses to patients is real. The Lilly-branded medicines that are the focus of the scheme, Trulicity® and Mounjaro®, are cold-chain products: they must be maintained at refrigerated temperatures, between 2 and 8 degrees Celsius, including during shipping. Among many other violations of Lilly's quality-control standards, the Defendants' black-market goods have been held by patients for unknown periods of time under unknown circumstances before being sold on the street. And then the Defendants further violate Lilly's quality-control procedures by shipping these temperature-sensitive medicines through normal mail or delivery services, without the benefit of the temperature monitoring or rigorously tested temperature-controlled containers used to ship authentic Lilly-branded medicines through the legitimate supply chain. The Defendants' scheme creates a serious risk that innocent patients will receive cold-chain medicines that have been stored outside of refrigerated temperatures for weeks or months. For this and several other reasons, all Lilly-branded medicines sold by the Defendants are materially different from the authentic medicines that Lilly sells in U.S. commerce, which as a matter of black-letter law renders the products infringing of Lilly's trademark rights and makes the Defendants strictly liable under the Lanham Act.

In this motion, Lilly respectfully seeks two forms of urgent, *ex parte* relief under the Lanham Act. First, Lilly seeks a temporary restraining order against all Defendants, to be converted into a preliminary injunction, prohibiting the Defendants from selling any Lilly-branded medicines. Second, Lilly requests an *ex parte* asset freeze order to prohibit the Defendants from

dissipating their ill-gotten gains. Lilly also seeks an expedited discovery order in support of the requested preliminary injunction. Lilly seeks this relief on an emergency basis to allow Lilly to immediately stop the Defendants from putting patients at risk through the sale of counterfeit and infringing Lilly-branded medicines, and to allow Lilly to quickly identify and investigate co-conspirators who are also engaged in the scheme.

## STATEMENT OF FACTS

### I. LILLY'S MEDICINES

Lilly discovers, develops, manufactures, and markets innovative medicines. Throughout its 150-year history, Lilly has worked to address some of the most pressing challenges facing humanity, including infectious disease, diabetes, depression, cancer, obesity, and Alzheimer's disease. Last year, more than 55 million people used Lilly's medicines.[1]

Lilly discovers, develops, manufactures, and markets human pharmaceuticals and invests heavily in research and development ("R&D"). In 2025, Lilly spent approximately $13.337 billion on R&D activities and employed approximately 12,000 people in R&D, including a substantial number of physicians, scientists holding graduate or postgraduate degrees, and highly skilled technical personnel. *See* Exhibit 14 to the Declaration of Geoffrey Potter, dated June 4, 2026 ("Potter Decl.").

Lilly owns trademarks related to the medicines that it markets and distributes. Specifically relevant to this motion, Lilly is the exclusive holder of numerous U.S. registered trademarks that appear on all Lilly-branded medicines, including the packaging, labeling, documentation, and self-injection pens of Trulicity® and Mounjaro®. A list of Lilly's relevant registered trademarks and

---

[1] Lilly, *U.S. Access & Affordability*, https://sustainability.lilly.com/social/us-access-affordability.

proof of their registration is set forth in the attached Declaration of Tiffany Trunko, dated June 4, 2026 ("Trunko Decl.").

### A. Lilly's Diabetes Medicines

In 2014, the FDA approved the use of Lilly's Trulicity®, a once-weekly injection indicated to improve glycemic control in adults with type 2 diabetes. Potter Decl. Ex. 15. Since then, Trulicity® has also been approved for children ten years of age and older living with type 2 diabetes. *Id.* Ex. 16. Trulicity® is a GLP-1 receptor agonist. *Id.* Ex. 15. The active ingredient in Trulicity® is dulaglutide. *Id.*

In 2022, the FDA approved Lilly's Mounjaro®, which is indicated to improve glycemic control in adults with type 2 diabetes. Potter Decl. Ex. 17. Mounjaro® is a glucose-dependent insulinotropic polypeptide (GIP) receptor and GLP-1 receptor agonist. *Id.* The active ingredient in Mounjaro® is tirzepatide. *Id.*

Millions of Americans use Trulicity® and Mounjaro® weekly. Potter Decl. Ex. 18. By the fourth quarter of 2025, Mounjaro® alone accounted for 48% of U.S. GLP-1 prescriptions for treatment of type 2 diabetes. *Id*.

### B. Lilly's Secure Supply Chain and Pricing

Subject to few exceptions not relevant here, in the United States Lilly sells its branded medicines only to a short list of Lilly-authorized distributors. Declaration of Senthil Rajaratnam, dated June 5, 2026 ("Rajaratnam Decl.") ¶ 9. Lilly lists these "authorized distributors of record" on its website. *Id.* Lilly sells Trulicity® and Mounjaro® to its U.S. authorized distributors at list price. *Id*. ¶ 10. List price, also referred to as wholesale acquisition cost or WAC, is the price at which Lilly sells its products to wholesalers. *Id.* The prices patients pay at the pharmacy may be

different and largely depend on the out-of-pocket costs set by their insurance provider, pharmacy charges, and/or discounts or financial assistance that may be available to the patient.[2]

As set forth below, the Defendants sell Trulicity® or Mounjaro® on pharmacy-to-pharmacy Platforms are at significantly below-WAC pricing. There is no legitimate reason why a retail pharmacy would regularly sell Lilly-branded medicines to other retail pharmacies on a Platform for prices significantly below Lilly's list price – and certainly not at large volumes. As the FDA has noted in its formal guidance to industry, pharmaceuticals "offered at a price that is 'too good to be true'" are a red flag for counterfeit and otherwise inauthentic product.[3] Lilly is the only source for Lilly-branded medicines, and as a matter of basic economics, the price of a box of Trulicity® or Mounjaro® is expected to go up, not down, as the medicines are sold from manufacturer to distributor to retail pharmacy. Moreover, as is standard in the industry, any undispensed expired or near-expired Lilly-branded medicines can be returned by pharmacies for a refund, minus a 10% fee. Potter Decl. Ex. 19. That 10% fee on returns is smaller than or equal to the per-sale fees charged by pharmacy-to-pharmacy Platforms.[4] If pharmacies selling on the Platforms at volume were buying authentic Lilly-branded medicines from the legitimate supply chain, they would be losing substantial money on every sale.

---

[2] *See* Lilly, https://pricinginfo.lilly.com/trulicity; Lilly https://pricinginfo.lilly.com/mounjaro (providing list price for Trulicity® or Mounjaro®). As is standard in the industry, WAC does not include minor post-purchase adjustments offered to authorized distributors, such as small prompt-pay discounts.

[3] FDA, Drug Supply Chain Security Act Implementation: Identification of Suspect Product and Notification - Guidance for Industry at 5, 7, *available at* https://www.fda.gov/media/88790/download.

[4] *See* Rxeed, *Pharmacy message*, https://rxeed.com/pharmacy_message (stating that "Premium sellers will be charged 15% instead of 10%"); RxPost, *Pricing plan*, https://www.rx-post.com/pricing (stating that a "Starter" account is charged a "10% Fee on Sales"); InStockRx, *Pricing plan*, https://www.instockrx.com/pricing/.

### C. Lilly's Quality-Control Standards

Lilly employs extensive and strict quality-control standards over all Lilly-branded medicines, including Trulicity® and Mounjaro®. *See* Declaration of David Wadsworth, dated June 4, 2026 ("Wadsworth Decl.") ¶ 6. To U.S. consumers, Lilly's trademarks represent that the medicine has been manufactured and distributed according to the highest quality standards. Some of the quality-control standards that are most relevant to the Defendants' infringement and improper conduct are discussed below.

#### 1. Temperature Control and Temperature Monitoring

Several Lilly-branded medicines, including Trulicity® and Mounjaro®, are cold-chain products: as stated prominently on their FDA-approved labeling, packaging, and instructions for use, they must be stored and transported at refrigerated temperatures, between 2 and 8 degrees Celsius.[5] Wadsworth Decl. ¶ 10. Lilly has developed extensive and strictly employed quality-control procedures to ensure its cold-chain medicines are shipped and stored within the required temperature range, and that Lilly is made aware of any temperature deviations. *Id.* ¶¶ 11-16.

For example, Lilly ensures that Trulicity® and Mounjaro® are transported to warehouses and distributors by tested and approved refrigerated trucks capable of maintaining the requisite temperature range. *Id.* ¶ 12. Each truck is outfitted with temperature monitors that will send an alert to Lilly's quality team if there is a deviation from the established temperature range, and Lilly conducts regular tests to ensure the accuracy of those temperature monitors. *Id.*

If there is any deviation at all from the temperature range in transport, the affected units of Trulicity® or Mounjaro® are quarantined upon arrival and held until they can be analyzed by a

[5] As stated in their accompanying instructions for use, patients may remove Trulicity® and Mounjaro® from the refrigerator for a limited period of time before use. Potter Decl. Exs. 34-35. As set forth in this section, Lilly's quality-control standards require the product be maintained at between 2 and 8 degrees Celsius at all times before it reaches the patient, including during shipping and storage.

Lilly team of quality-assurance professionals. *Id.* ¶ 14. The medicine remains quarantined unless and until the quality-assurance team determines, based on the available scientific data, that the medicines are fully safe and effective for dispensation to, and use by, a patient. *Id.* If the quality-assurance team is not able to make such a determination, the affected medicines are destroyed. *Id.*

Similarly, when shipping individual units or a small batch of units, Lilly's quality-control procedures require that Trulicity® and Mounjaro® be transported in specialized containers that will maintain the temperature of the medicine. *Id.* ¶ 15. Lilly extensively analyzes these containers before approving their use, including by field-testing them in real-world conditions on high-temperature summer days and low-temperature winter days. *Id*. These Lilly-approved containers are tested and approved to maintain the requisite temperature range for a set time period, and Lilly ships the medicines for next-day delivery. *Id.* ¶¶ 15-16. If any such delivery of Trulicity® or Mounjaro® is delayed, Lilly has systems in place to cancel the delivery and have the product automatically returned, where it can be quarantined and destroyed. *Id.* ¶ 16.

**2. Targeted Recalls**

Lilly also has quality-control protocols related to targeted recalls. In the unlikely event of a quality issue that requires a recall, Lilly's protocols call for the execution of that recall at the most targeted level that is appropriate: *e.g.*, by batch or lot number. Rajaratnam Decl. ¶ 19. To effect such a recall, Lilly gives notice through its legitimate supply chain – for example, to the authorized distributors who received the affected batch of medicine at issue, which permits the recall notice to be sent to those pharmacies that received the affected batch. *Id*. Targeted recalls are preferable to non-targeted recalls when only certain lots or batches are implicated. *Id* ¶ 20. Among other things, recall notices that reach companies that never received the affected batch of medicine can cause confusion on behalf of the recipient, leading to unaffected medicines being erroneously taken out of the supply chain and made unavailable to patients. *Id*. Moreover, targeted

recalls avoid "recall fatigue" where distributors and pharmacies become accustomed to seeing inapplicable recall notices and stop paying attention to them. *Id.*

When medicines are diverted from Lilly's authorized supply chain, it interferes with Lilly's ability to conduct an effective targeted recall. *Id.* ¶ 21. Lilly's records, and those of its authorized distributors, would no longer show how the medicine traveled through the supply chain. *Id*. While Lilly could notify the authorized distributor to whom it originally sold a medicine, there would be no way for Lilly or the distributor to determine what pharmacy received the later-diverted product, undermining the recall process. *Id*. This problem is exacerbated when records accompanying the sale of Lilly-branded medicines are missing or falsified, such as misidentifying the lot or serial number of a product, or giving an incomplete or falsified chain of custody, both of which interfere with Lilly's ability to trace and locate product subject to a recall. *Id*.

### 3. Pedigrees and Chain-of-Custody Information

All Lilly-branded medicines that are sold in the United States are required to be accompanied by what is known in the industry as "pedigree" information – either a written document known as a pedigree (also sometimes called a "T3" or "DSCSA" document), or, more recently, an electronic data transfer providing the same information. These pedigrees are part of the federal regulatory regime for the tracking, verification, and control of every transfer of a prescription medicine in the United States as established by the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. § 360eee *et seq.*, and its implementing regulations.

Enacted in the wake of a devastating fungal meningitis outbreak caused by contaminated medicines sold by a rogue distributor, the DSCSA's stated purpose was "to strengthen the

prescription drug supply chain in order to protect American families against counterfeit drugs."[6] Under the DSCSA, pedigrees are required to provide a full "transaction history" – a chain of custody for that individual unit of medicine going back to the original sale manufacturer. 21 U.S.C. § 360eee(25); 21 U.S.C. §§ 360eee-1(c)(1)(A)(i), (d)(1)(A)(i). Lilly maintains and provides the initial transaction information when it makes the original sale to a Lilly-authorized distributor, and then for each subsequent sale, the seller is required to provide the purchaser with an updated pedigree reflecting that latest sale. *Id.* The DSCSA prohibits a pharmacy from accepting any prescription drug without the accompanying pedigree information, including the transaction history. 21 U.S.C. § 360eee-1(c)(1)(A)(i). Medicines that are sold with false or suspect pedigree information, or with no pedigree information at all, must be quarantined and cannot be sold. *Id.* § 360eee-1(c)(4)(A).[7]

Historically, pedigrees have been documents (on paper or as PDF files) that accompany the physical unit of medicine as it changes hands. As contemplated by the DSCSA, recent FDA regulations have implemented an interoperable electronic data exchange system, known as EPCIS, to send and receive transaction information. *See* 21 U.S.C. § 360eee(25); Rajaratnam Decl. ¶¶ 11-12. FDA deadlines to adopt the EPCIS system have been extended repeatedly; large pharmacies

[6] Congressional Record H5960, Floor Statement of Representative Upton, dated Sept. 28, 2013, *available at* https://www.govinfo.gov/content/pkg/CREC-2013-09-28/pdf/CREC-2013-09- 28-pt1-PgH5946-2.pdf; *see also* FDA, Drug Supply Chain Security Act (DSCSA), *available at* https://www.fda.gov/drugs/drug-supply-chain-integrity/drug-supply-chain-security-act-dscsa (stating that the DSCSA's purpose is to "help protect consumers from exposure to drugs that may be counterfeit").

[7] *See also, e.g.*, FDA, Pharmacists: Utilize DSCSA Requirements to Protect Your Patients -, Guidance Document (July 3, 2019), https://www.fda.gov/drugs/drug-supply-chain-security-act-dscsa/pharmacists-utilize-dscsa-requirements-protect-your-patients (requiring pharmacies to "[q]uarantine and investigate suspect prescription drugs to determine if they are illegitimate" upon receipt of drugs that may be counterfeit).

were exempt from the EPCIS system until late 2025, and smaller pharmacies remain exempt until November 2026.[8] Potter Decl. Ex. 20.

Whether transmitted as a document or as information in the EPCIS electronic system, accurate pedigree information that comports with the DSCSA is part of the product that Lilly sells. Rajartnam Decl. ¶ 12. At each step in the supply chain, pedigree records identify the Lilly-branded medicine at issue and provide information about the individual unit of medicine being sold, as well as when and to whom a specific unit of medicine was bought by and sold from. *Id.* This information can be crucial in a quality investigation of a product. *Id.* ¶ 14.

Unlawfully diverted medicines, such as already-dispensed medicines that are purchased from patients and resold as new, by definition cannot have valid pedigrees. A valid pedigree cannot state as part of the transactional history that it was purchased from a patient off the street. Lilly of course would never permit a Lilly-branded medicine that had already been dispensed to a patient to be resold or re-dispensed. Wadsworth Decl. ¶ 17.

### 4. Lilly's Packaging and Patient-Information Documentation

The products that Lilly sells under the brand names Trulicity® and Mounjaro® consist of multiple components, each of which is approved by the FDA. In addition to the medicines themselves, the product comes in FDA-approved packaging. Rajaratnam Decl. ¶ 4. Each package contains four pre-filled delivery devices, known as "pens," that allow patients to self-inject the medicine. *Id.* ¶ 5. Every package also contains separate FDA-approved and -required instructions for use and prescribing information (together, "Patient Information Documents") which contain critical information such as how to administer the medicine, important patient warnings, and

[8] FDA, "Waivers and Exceptions Beyond the Stabilization Period," https://www.fda.gov/drugs/drug-supply-chain-security-act-dscsa/waivers-and-exemptions-beyond-stabilization-period; *see also* Potter Decl. Ex. 20.

information about drug interactions and contraindications. *Id.* ¶ 6. Because Trulicity® and Mounjaro® are injectable medicines that patients self-administer, the Patient Information Documents are particularly important to patients. Those Patient Information Documents are part of the product that Lilly sells and must not be removed before dispensation to a patient. *Id.*

## II. THE PHARMACY-TO-PHARMACY PLATFORMS

The Platforms are websites that allow pharmacies to act as unlicensed pharmaceutical wholesalers. Specifically, the Defendants sold the medicines at issue here on at least three separate Platforms: (1) www.RxWorld.com ("RxWorld"); (2) www.Rxeed.com ("Rxeed"); and (3) www.MatchRx.com ("MatchRx"). Lilly has also identified numerous other pharmacy-to-pharmacy Platforms on which purported Lilly-Branded Medicines are or have been sold, including www.Trxade.com ("Trxade"); www.EzriRx.com ("EzriRx"); www.TradeNetRx.com ("TradeNetRx"); and www.InStockRx.com ("Instock"). All of these Platforms are based in the United States.

Each of these Platforms functions in essentially the same way. They operate websites that allow pharmacies to list prescription medicines for sale, to be purchased by other pharmacies. Similar to other online sales platforms, such as eBay, the Platforms do not take title to the medicines being sold,[9] but rather host the listings and facilitate the transaction between the buying and selling pharmacy in exchange for a fee, [10] usually a cut of 10% or more of the sales price.[11]

---

[9] *See, e.g.*, InStockRx, *How to buy medications*, https://www.instockrx.com/how-to-buy-medications; RxPost, *FAQ*, https://www.rx-post.com/faq

[10] *See, e.g.*, Rxeed, *FAQ*, https://rxeed.com/faq; InStockRx, *How to Buy Medications*, https://www.instockrx.com/how-to-buy-medications; RxPost, *FAQ*, https://www.rx-post.com/faq

[11] *See, e.g.* Rxeed, *Pharmacy message*, https://rxeed.com/pharmacy_message (; RxPost, *Pricing plan*, https://www.rx-post.com/pricing; InStockRx, *Pricing plan*, https://www.instockrx.com/pricing/

Pharmacy sellers set their own prices,[12] and many of the products, including purportedly Lilly-branded medicines, are sold at significantly below WAC.

By limiting all access to the Platform to member pharmacies, the Platforms ensure that manufacturers like Lilly, as well as law enforcement and regulatory agencies, have no visibility into what is being sold on the Platforms.[13] As set forth in more detail below, Lilly investigated the Platforms at issue in this lawsuit and made test buys from the Defendants through cooperating pharmacies. Declaration of Hannah Lee, dated June 4, 2026 ("Lee Decl.") ¶ 6. Adding another layer of secrecy, most Platforms also do not permit buyers to see the name of the pharmacy seller until a transaction is complete. *Id.* ¶¶ 15g, 31c, 45c, 46c, 54c. This made it impossible for the cooperating pharmacy to identify and monitor suspect sellers and view the entirety of their listings on a single Platform, let alone across all Platforms. *See id*. The Defendants' sales that Lilly knows about thus represent only the tip of the iceberg; discovery will reveal the true scale of Lilly-branded medicines sold by Defendants (and others) on the Platforms.

## III. CRIMINAL AND CIVIL ACTIONS INVOLVING THE PLATFORMS AND BOUGHT-BACK MEDICINES

The pharmacy-to-pharmacy Platforms provide bad actors like Defendants a hidden and *de facto* unregulated black market to traffic illicit pharmaceuticals — and the Defendants are not the first. In the past two years, this District and the Southern District of New York have seen criminal actions and Lanham Act civil lawsuits that have laid bare schemes similar to those that the Defendants have engaged in here — using Platforms to sell black-market pharmaceuticals, including those repurchased from patients — resulting in criminal and civil liability.

[12] *See* InStockRx, *How to Sell*, https://www.instockrx.com/posting-medications; Rxeed, *FAQ*, https://rxeed.com/faq

[13] *See* RxWorld, *Registration*, https://www.rxworld.com/registration; Rxeed, FAQ, https://rxeed.com/faq; InStockRx, *Frequently Asked Questions*, https://instockrx.com/

For example, in *United States v. Aminov*, 1:23-cr-110 (S.D.N.Y.), the U.S. Attorney's Office for the Southern District of New York charged a large group of co-conspirators with selling "diverted black-market prescription HIV medication" that had been purchased back from patients on the street. Potter Decl. Ex. 21. In what the government dubbed the "Online Marketplace Scheme," some of the defendants were charged with "selling diverted black-market medicine through online prescription drug marketplaces." *Id*. As the indictment explained:

> In order to sell on the Online Marketplaces, sellers of prescription medicines must attest that they agree to follow all federal and state regulations .... But rather than sell legitimately sourced prescription medicines [defendants] sold diverted medicine that they had purchased through illegitimate channels .... Other pharmacies purchased that medicine on the Online Marketplaces .... In this regard, [defendants] defrauded the pharmacies that believed they were purchasing legitimately-sourced medicine.

*Id.* One defendant "sold approximately $9 million of drugs" on the Platforms, while another defendant sold $500,000 worth of prescription medicines. *Id.* The case is ongoing; most of the defendants charged with operating the Online Marketplace Scheme have pled guilty and are serving custodial sentences, the longest of which is 72 months. Potter Decl. Ex. 22.

In the civil context, another major pharmaceutical manufacturer filed suit in this District to enjoin numerous defendants, including those in *Aminov* as well as a separate set of pharmacy owners engaged in an essentially identical scheme. *Gilead Scis., Inc. v. Khaim*, No. 24-cv-4259 (E.D.N.Y.) (hereinafter, "*Khaim*"). The pharmaceutical manufacturer brought Lanham Act claims on the basis of, among other things, evidence that defendants had used online pharmacy-to-pharmacy Platforms to sell counterfeit and infringing versions of the plaintiff's branded medications, including on MatchRx. *Id.* ECF No. 1. The manufacturer also presented evidence that the defendants tried to pass off the medications sold on the Platforms as legitimate by using false paperwork that made unauthorized use of the manufacturer's registered trademarks. *Id.* ECF

Nos. 2-5 and 9. In *Khaim*, this Court granted the manufacturer's request for the same relief sought here: an *ex parte* temporary restraining orders and asset freeze order against all defendants engaged in the scheme, and expedited discovery in advance of a preliminary injunction hearing. Potter Decl. Exs. 10-12. In *Khaim*, the parties responsible for selling diverted medicines through the Platforms are now subject to ten-figure judgments. *Khaim*, No. 24-cv-04259, ECF No. 214; *see also Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 59-60 (E.D.N.Y. 2023) (hereinafter "*Safe Chain*") (describing, in an earlier-filed action, the process by which counterfeiters and diverters in New York, New Jersey, and Florida effected a coordinated operation to purchase medicine in large quantities off the street, after which the medicines were collected, stripped of their pharmacy patient labeling, and processed for resale).

In addition and most recently, in April 2026 another pharmaceutical manufacturer filed suit in this District to enjoin several defendants, including pharmacies and their principals, from selling infringing and counterfeit HIV medicines on the Platforms. *Gilead Scis. Inc., et al. v. Pain Relief Rx Inc. et al*, No. 26-cv-02172 (E.D.N.Y.). The manufacturer presented evidence that: (i) the defendants operated sham pharmacies for the purpose of selling already-dispensed HIV medicines on the Platforms; (ii) the defendants sold the medicines outside authorized distribution channels and took steps, including removing previously-applied patient labels, to deceive the purchaser into believing they were receiving new, authentic units of medicine; and (iii) the defendants sold the medicines without Patient Information Documents and violated the manufacturer's quality control procedures. *See Pain Relief*, 26-cv-02172, ECF Nos. 3-1, 5, and 7. Based on this evidence, the Court granted the manufacturer's requests for a temporary restraining order, asset freeze order, and expedited discovery order. *See* Potter Decl. Exs. 1-3. The case is currently pending.

## IV. DEFENDANTS' SALE OF INFRINGING LILLY-BRANDED MEDICINES ON PHARMACY-TO-PHARMACY PLATFORMS

After the *Aminov*, *Khaim*, and related cases became known in the industry, Lilly launched a counsel-led investigation into the sale of Lilly-branded medicines on the Platforms. To do so, Lilly worked with cooperating pharmacists who became members of various Platforms and made test buys of Lilly-branded medicines at the direction of Lilly's counsel, including test buys from the Defendant pharmacies here. As set forth below, the Defendants sell Trulicity® and Mounjaro® at significantly below-WAC pricing on pharmacy-to-pharmacy Platforms, which the Defendants advertise to be new, authentic Lilly-branded medicines. In reality, the evidence shows that Defendants are selling black-market drugs that were previously dispensed to patients, purchased back from those patients for cash, stripped of their prior patient labelling, and fraudulently re-sold on the Platforms, putting innocent patients at risk.

### A. The Instant Rx Defendants

Instant Rx is a retail pharmacy located in this District: Glendale in Queens County. Lee Decl. ¶ 8. David Aulov, its principal, registered Instant Rx in early 2024 as a pharmacy. *Id.* ¶ 10. Thomas Johnson, who maintains active pharmacist licenses in New York and Florida, is the supervising pharmacist of Instant Rx. *Id.* ¶¶ 12-13.

Instant Rx is not a legitimate retail pharmacy. Its sole retail location has been closed since early 2025. *Id.* ¶ 16. But as described below, the closure of the pharmacy did not prevent sit from selling infringing Lilly-branded medicines on the pharmacy-to-pharmacy Platform Rxeed.

On August 22, 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed. *Id.* ¶ 15a. One package was available for $730, *see id.* ¶ 15b, at the time representing a 26% discount off Trulicity's® WAC. The "Product Details," shown below, provided that the package

is "full," and in its "[s]ealed [o]riginal [c]ontainer." Lee Decl. ¶¶ 15c, 15d. The lot number is listed as D756265A, and the manufacturer is (incorrectly) listed as Lilly's Dutch affiliate. *Id.*

**Products Details**

**Trulicity Subcutaneous Injection, solution**

| | |
|---|---|
| NDC Number | 00002-1434-80 |
| Strength | 1.5 MG |
| Dosage | Injection, solution |
| Manufacturer | Eli Lilly Nederland B.V. |
| Pack Size | 4 |
| Price | 730 |
| Expiration Date | 12-25 |
| Quantity in Stock | 1 |
| Lot# | D756265A |
| Pack Quantity | full |
| Package Condition | Sealed Original Container |
| Is Fridge Item | Yes |

The same seller had a total of **302** items for sale at the time on Rxeed. *Id.* ¶ 15e. In August 2025, the cooperating pharmacist purchased the Trulicity® described above, which was delivered by Instant Rx. *Id.* ¶¶ 15f, 15g.

In the regular course of business, Lilly maintains records of its sales of units of Lilly-branded medicines like Trulicity®, searchable by the lot number and unique serial number on the box. Rajaratnam Decl. ¶ 7. When the Trulicity® from Instant Rx arrived, Lilly searched its internal records, which showed that this particular box of Trulicity® had not been sold to a Lilly-authorized distributor, but rather had been dispensed through a program administered by the Lilly Cares® Foundation, a nonprofit charitable foundation, in April 2025. *Id.* ¶ 17. Through the program it administers, the Lilly Cares® Foundation provides Lilly-branded medicines to lower-

income patients at no cost.[14] Through the Lilly Cares® Foundation's program, these medicines are shipped directly to the patient or her physician; they are not provided to Lilly-authorized distributors or dispensed through pharmacies. *Id.* And yet this box of Trulicity®, which had been provided directly to a patient for no cost in April 2025, was being sold by Instant Rx on a Platform in August 2025. In short, the evidence is clear that Instant Rx unlawfully sold a product that had been dispensed to a patient through a charitable foundation, was unlawfully re-acquired from that patient, and then resold as new on an online Platform.

The cooperating pharmacist repeatedly sought a pedigree from Instant Rx, but Instant Rx refused to respond. Lee Decl. ¶ 15i.

### B. The Ira's Discount Pharmacy Defendants

Ira's Discount Pharmacy operates out of two storefronts that are a stone's throw from each other in the same Palm Beach County, Florida strip mall. Two separate entities occupying those storefronts both do business as Ira's Discount Pharmacy: (1) Dispensing Physician Consultants, Inc. ("DPC") and (2) Sofko LLC ("Sofko"). Lee Decl. ¶¶ 17, 23. Sofko additionally does business under the name Total Care Pharmacy. *Id.* ¶ 17. The image below, obtained from Google Maps, shows the two Ira's Discount Pharmacy locations: Sofko (the storefront on the left) and DPC (the storefront on the right), separated only by a restaurant.

[14] *See* Lily Cares® Foundation Patient Assistance Program, https://www.lillycares.com/




Both DPC and Sofko are owned and operated by George Drogaris and Prokopios Panagakos. Lee Decl. ¶¶ 18, 24. According to news reports, Drogaris operates the pharmacies from his home in Staten Island, New York, while Panagakos runs the pharmacies day-to-day.[15] Drogaris founded DPC in 2004 and Sofko in 2009. Lee Decl. ¶¶ 18, 24. He registered each as pharmacies, but not wholesalers, with the Centers for Medicare and Medicaid Services ("CMS"). *Id.* ¶¶ 17, 23.

Sue A. Pepper is the supervising pharmacist of DPC and maintains active pharmacy licenses in both New York and Florida. Lee Decl. ¶¶ 26-27. Mirjana Tasic-Pantic is the supervising pharmacist of Sofko. Lee Decl. ¶ 21.

In 2012, a New York-based non-profit health insurer sued DPC for fraudulent billing between 2006 and 2009. Potter Decl. Ex. 23. DPC was alleged to have submitted false claims

[15] Boca Magazine, Two Delray Pharmacies Top Opioid Recipients, and What About IPIC?, https://bocamag.com/delray-opioid-pharmacies-dea/

for brand name drugs while dispensing generics or no drugs at all. *Id.* The case settled in 2013. *Id.* Ex. 24.

### 1. Ira's Discount Pharmacy Provides an Incorrect Invoice and Pedigree

In July 2025, a cooperating pharmacist logged on to RxWorld and reviewed the Trulicity® then available. Lee Decl. ¶ 31a. Two purportedly new, authentic packages of Trulicity® were on offer at a discount by a pharmacy seller, one for $865, expiring February 2026, and one for $870, expiring January 2026. *Id.* ¶ 31b. At the time, these prices represented an approximately 12% discount off WAC. Reviewing the "same seller products" tab showed the same (at the time anonymous) pharmacy had listed both packages of Trulicity®, along with a host of other medicines for sale at steep discounts, including expensive HIV medications. *Id* ¶ 31c.

The next day, the cooperating pharmacist checked if the two packages of Trulicity® were still available on RxWorld. *Id.* ¶ 31d. One had already been sold, but the Trulicity® expiring January 2026 on sale for $870 was still available. *Id.* ¶ 31e. The cooperating pharmacist purchased that medicine, and it arrived from a pharmacy listed on the invoice as "Ira's Discount Pharmacy." *Id.* ¶¶ 31f, 31g.

When the Trulicity® arrived, there was a mismatch between the lot number, serial number, and expiration date written on the *invoice*—**D742742A**, **326214555622**, and **January 2026**—and the lot number, serial number, and expiration date on the *actual package*—**2100526A**, **344377870214**, and **April 28, 2026**. Lee Decl. ¶ 31g, 31h. Each is pictured below. *Id.*



| | ITEM(S) | EXP DATE | LOT # |
|---|---|---|---|
| | Trulicity 0.75mg/0.5mL Solution for Injection<br>00002-1433-80<br>Serial #:326214555622<br>0.75 MG<br>Solution for InjectionSolution for Injection<br>Original Package-Sealed | 01/2026 | D742742A |




The cooperating pharmacist contacted Ira's Discount Pharmacy and asked for the DSCSA-required pedigree for the box of Trulicity®. *Id.* ¶ 31i. Panagakos responded by sending the purported pedigree on behalf of Ira's Discount Pharmacy by email. *Id.* ¶ 31j. The purported pedigree did not provide the lot or serial number for the box of Trulicity®. Lee Decl. Ex. 13. However, the purported pedigree showed a chain of custody entirely within Lilly's legitimate, authorized supply chain: an original sale by Lilly to its authorized distributor McKesson, followed by a sale from McKesson to Ira's Discount Pharmacy. *Id.*

However, that purported pedigree did not match the product that Ira's Discount Pharmacy actually delivered. Lilly checked its internal records for the unit of Trulicity® that Ira's Discount Pharmacy sold to the cooperating pharmacist. Rajaratnam Decl. ¶¶ 15-16. Contrary to the pedigree provided by Ira's Discount Pharmacy, Lilly had ***not*** sold that box of medicine to McKesson – it had sold it to a different Lilly-authorized supplier. *Id.*

### 2. Ira's Large-Volume Sales of Lilly Medicines on Platforms – Including a Box Previously Dispensed by Another Pharmacy

After receiving the suspect product with a non-matching invoice and pedigree from Ira's Discount Pharmacy, counsel for Lilly directly contacted two Platforms, RxWorld and MatchRx, and obtained records of Ira's Discount Pharmacy's sales of Lilly-branded medicines. Potter Decl. ¶ 25 (RxWorld) and ¶ 26 (MatchRx). Those records indicate that in recent years Ira's Discount Pharmacy sold ***over 500 boxes*** of Lilly-branded medicines on RxWorld, and dozens more on

MatchRx; the overwhelming majority of those sales on both Platforms were Trulicity® and Mounjaro®. *Id.* The purchase prices for these transactions were uniformly below the medicines' WAC prices. *Id.* A large number of the sales on RxWorld were to pharmacies in New York, including Brooklyn, with the latest sale occurring just days before RxWorld provided the data, indicating the sales were ongoing. *Id.*

Of those many hundreds of sales, the records provided by the Platforms identified the serial number for only a handful of the units of Lilly-branded medicine that Ira's Discount Pharmacy had sold. *Id.* As a spot check, Lilly attempted to trace some of those products by serial number, by using Lilly's internal records and submitting trace requests to its authorized distributors. Rajaratnam Decl. ¶ 19. Through that process, Lilly identified a box of Trulicity® that, the evidence shows, was previously dispensed to a patient before Ira's Discount Pharmacy acquired it on the black market. Lee Decl. ¶ 32.

Specifically, Lilly traced a box of Trulicity® with the unique serial number 016948322452, and confirmed from its internal records that Lilly sold that box to an authorized distributor. Rajaratnam Decl. ¶ 18. Lilly submitted a trace request to that authorized distributor, which confirmed it sold that same box of Trulicity® to an independent pharmacy in Hokes Bluff, Alabama. *Id.* Lilly's investigators contacted the Alabama pharmacy, which confirmed that all the Trulicity® it purchased had been dispensed to patients, and that it had never sold or transferred any Trulicity® to another pharmacy. Lee Decl. ¶ 32. And yet MatchRx's records show that Ira's Discount Pharmacy in Florida subsequently sold that same box, bearing the same serial number, through the Platform to a different pharmacy in Wisconsin. Potter Decl. Ex. 26. In sum, the evidence shows that Ira's Discount Pharmacy sold on a Platform a box of Trulicity® that had been previously dispensed to a patient in Alabama.

This pre-suit evidence shows that Ira's Discount Pharmacy has been using Platforms to sell infringing Lilly-branded medicines in extremely large quantities at below-WAC prices, including products with incorrect pedigrees and invoices, and including products that had been recently dispensed to an out-of-state patient. In short, the evidence shows that Ira's Discount Pharmacy is using online Platforms to run an unlicensed and illegal pharmaceutical wholesale business.

In fact, from June 2021 through April 2022, Drogaris and Panagakos operated a licensed pharmaceutical wholesale supply company named Delray Wholesale LLC ("Delray Wholesale"). Lee Decl. ¶ 33. Delray Wholesale was located in the unit adjacent to Sofko and in the same shopping center as both Ira's Discount Pharmacy entities. *Id.* ¶ 34. Despite controlling a licensed wholesaler, by April 2022, Drogaris and Panagakos decided to shutter Delray Wholesale and convert to illicit "pharmacy-to-pharmacy" sales via the Platforms. *Id.* ¶ 35.

### C. The Glen Cove Drugs Defendants

Glen Cove Drugs is a pharmacy located in this District, in Glen Cove, Nassau County. Lee Decl. ¶ 36. Simeon Pinkhasou is Glen Cove Drugs' organizer. *Id.*, Ex. 15. Pinkhasou registered Glen Cove Drugs as a retail pharmacy in 2023, listing himself as president. *Id.* ¶ 37. In February 2025, Yuriel Sezanayev replaced Pinkhasou as the president in Glen Cove Drugs' registration with CMS. *Id.* ¶ 39. Halima Syed is Glen Cove Drugs' supervising pharmacist. *Id.* ¶ 42. Syed is also the supervising pharmacist of a pharmacy in New Jersey. *Id.* ¶ 43. That arrangement violates New York law, which requires a supervising pharmacist to work full time at the pharmacy and only be designated as the supervisor for one pharmacy at a time.[16]

[16] N.Y. Educ. Law § 6808(2)(e); *see also* New York State Education Department, "Supervising Pharmacist," https://www.op.nysed.gov/professions/pharmacy-establishments/information/supervising-pharmacist.

In August 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed. Lee Decl. ¶ 45a. Among the offerings was a listing for $650, *see id.* ¶ 45b, at the time representing a 34% discount from WAC. While the identity of selling pharmacy remained hidden, the Platform indicated that the seller had more than 10 other packages of Trulicity® for sale on Rxeed at the time. *Id.* ¶ 45c. The cooperating pharmacist purchased a box Trulicity®, and when it arrived, the accompanying invoice indicated the selling pharmacy was Glen Cove Drugs. *Id.* ¶ 45d.

In October 2025, another cooperating pharmacist searched for Trulicity® available on Rxeed. *Id.* ¶ 46a. Among the offerings was a listing for $750, *see id.* ¶ 46b, at the time representing 24% discount from WAC. While the seller's identity remained hidden, the Platform indicated that the same seller had five other packages of Trulicity® for sale on Rxeed at the time. *Id.* ¶ 46c. The cooperating pharmacist purchased the medicine, and when it arrived the accompanying invoice again indicated that Glen Cove Drugs was the seller. *Id.* ¶ 46d.

As shown in the images below, the second Glen Cove Drugs medicine arrived visibly damaged and with a clear shiny residue on the package. Potter Decl. Ex. 27. That residue does not appear on authentic packages of Trulicity and is consistent with a solvent being used to remove a patient label from the package. *Id.*






In November 2025, a cooperating pharmacist searched for Trulicity® available on Rxeed. Lee Decl. ¶ 46g. Among the offerings was a listing for sale for $699, *see id.* ¶ 46h, at the time representing a 29% discount off WAC. While the identity of the selling pharmacy remained hidden, the cooperating pharmacist could see that the same seller had more than **500** other medicines for sale on Rxeed at the time. *Id.* ¶ 46i. The cooperating pharmacist purchased the Trulicity®, and the accompanying invoice indicated the selling pharmacy was, once again, Glen Cove Drugs. *Id.* ¶ 46j.

As shown in the image below, the third Glen Cove Drugs package arrived bent and damaged. Potter Decl. Ex. 28. Moreover, small bits of the package's outer layer had been torn off in the area left blank for patient labels to be attached, consistent with the removal of a patient label. *Id.*



The cooperating pharmacist requested pedigree information for the Lilly-branded medicines received from Glen Cove Drugs, but despite numerous follow-up attempts, Glen Cove Drugs did not provide any. Lee Decl. ¶ 46l.

After receiving multiple infringing boxes of Lilly-branded medicine from Glen Cove Drugs, Lilly's investigators looked at public postings made by its principals. *Id.* ¶ 41. Sezanayev had the following posted to his Facebook page:




*Id*.

### D. The Elite Pharmacy Defendants

Elite Pharmacy is a retail pharmacy in Philadelphia, Pennsylvania that is owned and operated by Yakov Berezhinsky and Yuriy Levitan. Lee Decl. ¶ 48. Berezhinsky registered the company as a retail pharmacy in 2016. *Id.* ¶ 47. Christina Tolis is the supervising pharmacist of Elite Pharmacy. *Id.* ¶ 51.

Both Berezhinsky and Litvan have ties collectively to two Philadelphia-based pharmacies, JJ Pharmacy, Inc. and Future Pharmacy, Inc., *see id.* ¶ 50, which were the subject of a prior False Claims Action brought by the Department of Justice. The government alleged the two pharmacies billed Medicare for prescription medications that were not actually dispensed. Potter Decl. Ex. 36. In 2023, the government settled with the pharmacies and their owners for $3.5 million. *Id.*

Tolis also has ties to other criminal pharmacies. Before working for Elite Pharmacy, Tolis served as the supervising pharmacist for Haussemann's Pharmacy in Philadelphia, Pennsylvania. Lee Decl. ¶ 52. In July 2025, the Pennsylvania Attorney General charged Haussemann's Pharmacy

for purchasing HIV medications from illegitimate wholesalers and then dispensing those medications to patients. Potter Decl. Ex. 13.

In early October 2025, a cooperating pharmacist searched RxWorld for Trulicity®. Lee Decl. ¶ 54a. One package was available for $880, *see id.* ¶ 54b, at the time representing 11% discount off WAC. While the cooperating pharmacist could not see the identity of the selling pharmacy, a review of the other products available from the same seller revealed **hundreds** of other pharmaceuticals being offered at steep discounts. *Id.* ¶ 54c. The cooperating pharmacist purchased the Trulicity®, which was delivered to an address in this District. *Id.* ¶ 54d. When it arrived, the invoice showed that Elite Pharmacy was the selling pharmacy. *Id.*

The package of Trulicity® showed several signs of already being dispensed. As shown in the pictures below, the package was significantly damaged. Potter Decl. Ex. 29. Moreover, there was a prominent red mark on the side of the medicine. *Id.* Pharmacists often use a red pen to show that they have checked a medicine immediately before dispensing it to a patient.[17]




[17] Drug Topics, The red pen rules: How to prevent pharmacy error, https://www.drugtopics.com/view/red-pen-rules-how-prevent-pharmacy-error




In late October 2025, the cooperating pharmacist again searched RxWorld for Trulicity®. Lee Decl. ¶ 54e. The cooperating pharmacist purchased a package for $880, *see id.*¶ 54f, at the time representing an approximately 11% discount from WAC. When it arrived at an address in this District, the accompanying paperwork indicated the seller was again Elite Pharmacy. *Id.* ¶ 54g.

The second Elite Pharmacy package also showed signs of already having been dispensed. On the area left blank for patient labels to be attached, the package had a significant amount of sticky residue and small areas where bits of the outer packaging had been ripped off, consistent with the removal of a pharmacy patient label, as visible in the images below. Potter Decl. Ex. 30.





The cooperating pharmacist sought from Elite Pharmacy the DSCSA-required pedigree information for the two boxes of Trulicity®, but the Elite Pharmacy Defendants stonewalled the pharmacist and did not provide it. Lee Decl. ¶ 54i.

### E. The Atlas Drug Defendants

Atlas Drug is a pharmacy in Wyckoff, New Jersey owned and operated by Francisco Marcos through his company, T&F. Lee Decl. ¶¶ 55-56. Marcos is a convicted medical fraudster. The United States Attorney's Office for the District of New Jersey charged Marcos with healthcare fraud. Potter Decl. Ex. 32. Marcos pled guilty and admitted to operating a pharmacy through which he submitted hundreds of fraudulent claims to the Federal Employees Health Benefits Program. Potter Decl. Ex. 33.

In October 2025, a cooperating pharmacist searched Rxeed for Mounjaro®. Lee Decl. ¶ 59a. Of the many available was one package for only $349, *see id.* ¶ 59b, at the time representing a 68% discount. As shown in the image below, the "Package Quantity" was listed as "partial[,] Open Original Bottle / Torn or label" and the "Partial Quantity" as "2." *Id.* ¶ 59d. Lilly's Dutch affiliate is (incorrectly) listed as the "Manufacturer." *Id.* The cooperating pharmacist purchased the Mounjaro®, and it was shipped to an address in this District. *Id.* ¶ 59e.

**Products Details**

**Mounjaro Subcutaneous Injection, solution**

| | |
|---|---|
| NDC Number | 00002-1457-80 |
| Strength | 15 MG |
| Dosage | Injection, solution |
| Manufacturer | Eli Lilly Nederland B.V. |
| Pack Size | 4 |
| Price | 349 |
| Expiration Date | 03-27 |
| Quantity in Stock | 1 |
| Lot# | D836364D |
| Pack Quantity | partial |
| | Open Original bottle/ Torn or label |
| Package Condition | residue |
| Is Fridge Item | Yes |
| Partial Quantity | 2 |

When it arrived, the invoice accompanying the medicine showed Atlas Drug sold the medicine. *Id*. The package had obviously been previously dispensed to a patient and opened. As shown in the images below, the remnants of a partially removed patient label were clearly visible on the package. Potter Decl. Ex. 31. In addition, the package weighed materially less than an authentic Lilly package of Mounjaro®. Lee Decl. ¶ 59f. This was because the package contained

only two of the four doses that appear in a new authentic package of Mounjaro® and was also missing the required Patient Information Documents.




The cooperating pharmacist sought the pedigree information from Atlas Drug, but despite repeated follow ups, the Atlas Drug Defendants refused to provide a pedigree. Lee Decl. ¶ 59h.

## ARGUMENT

Lilly respectfully submits that the extraordinary facts of this case, the serious public health risk presented by the diverted medicines sold by the Defendants, and black-letter Lanham Act case law all make clear that Lilly is entitled to the temporary restraining order (to be converted to a preliminary injunction) and asset freeze order that it seeks in this motion.

### I. LILLY IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AGAINST DEFENDANTS

"Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages." *Multi-Local Media Corp. v. 800 Yellow Book, Inc.*, 813

F. Supp. 199, 202 (E.D.N.Y. 1993). Here, Lilly seeks a temporary restraining order to stop the Defendants' trafficking of counterfeit and diverted Lilly-branded medicines and ensure that evidence, including any physical counterfeit or infringing product, is preserved. To obtain such relief, Lilly must demonstrate that it has personal jurisdiction over the Defendants, and that Lilly is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Lilly meets all of those elements and therefore is entitled to immediate injunctive relief.

**A. This Court Has Personal Jurisdiction Over the Defendants**

This Court has personal jurisdiction over each Defendant. Certain Defendants are New York residents and therefore subject to this Court's general personal jurisdiction. The Court also has specific personal jurisdiction over certain other Defendants because they sold the infringing Lilly-branded medicines at issue into New York to a resident of this District.

Instant Rx, Aulov, Drogaris, Glen Cove Drugs, Pinkhasou and Sezanayev are each residents of New York. Lee Decl. ¶¶ 8, 11, 19, 36, 38, 40. The Court therefore has general jurisdiction over each of these defendants. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (explaining that residents of a state are subject to general personal jurisdiction in that state).

The Ira's Discount Pharmacy Defendants, the Elite Pharmacy Defendants, the Atlas Drug Defendants, Johnson, and Syed sold the medicines at issue from or to pharmacies in New York, including at least one pharmacy in this District, and did so through an interactive website that was accessible by New York purchasers. *See supra* 20-21, 26-31. The Court therefore has specific personal jurisdiction over those defendants. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (finding New York's long-arm statute "is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never

enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" (cleaned up)). A purchase by an investigator or cooperating purchaser working under the direction of the plaintiff or its counsel is sufficient to establish personal jurisdiction. *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 278–79 (2d Cir. 2024), *cert. denied sub nom. Zembrka v. Am. Girl, LLC.*, 145 S. Ct. 1130 (2025) (affirming personal jurisdiction based on test purchase made by plaintiffs' counsel in New York); *Mattel, Inc. v. Procount Bus. Servs.*, No. 03 Civ. 7234 (RWS), 2004 WL 502190, at *2 (S.D.N.Y. Mar. 10, 2004) (finding single sale of infringing product into New York sufficient to establish specific personal jurisdiction, and holding "[t]he fact that this sale was to [plaintiff's] investigator is irrelevant").

### B. Lilly Has a Strong Likelihood of Success on the Merits

Lilly alleges that Defendants infringed its trademarks in violation of the Lanham Act. To prevail on these claims, Lilly "must show that 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 557 (E.D.N.Y. 2017) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995)).

None of the elements are in question here. ***First,*** Lilly owns multiple distinct, valid, registered trademarks for the products at issue, including Trulicity® and Mounjaro®. Trunko Decl. ¶ 4. Lilly's registration of those marks establishes their validity. *See Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). ***Second,*** the Defendants' unauthorized use of Lilly's valid and protected marks by advertising, buying, selling, and distributing products bearing those marks, including Trulicity® and Mounjaro®, is likely to result in confusion. In fact, as set forth below, the Defendants' sale of materially altered and counterfeit products as though

they were authentic Lilly-branded medicines creates a presumption of consumer confusion as a matter of law. *See infra* pp. 41-43.

**1. Defendants Are Liable for Selling Counterfeit and Materially Different Products that Undermine Lilly's Quality-Control Procedures**

The Defendants are liable for trademark infringement under the Lanham Act under three separate theories of infringement: the quality-control doctrine, the material-differences doctrine, and counterfeiting. Each of these three theories, standing alone, establishes a likelihood of consumer confusion and entitles Lilly to all the injunctive relief it seeks in the instant motion.

**a. The Quality-Control Doctrine**

The quality-control doctrine provides that it is an act of infringement to sell goods in a way that "do[es] not conform to the trademark holder's quality-control standards." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009). This is because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark," and so "interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark." *Id.* (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)). When a defendant sells goods that interfere or do not conform with one of the trademark holder's quality-control procedures, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Id.* at 246 (quoting *El Greco*, 806 F.2d at 395).

As set forth above, all Defendants have sold black-market versions of Lilly-branded medicines that, the evidence shows, were acquired from patients off the street, stripped of their patient labelling, and resold as new. There can be no question that re-selling a box of Trulicity® and Mounjaro® that was already dispensed to a patient violates Lilly's quality-control standards.

Wadsworth Decl. ¶ 17. Lilly would never allow one of its Lilly-branded prescription medicines to be maintained by a patient for an unknown period of time under unknown conditions and then resold as new to another patient. *Id.* On its face and on its own, that is more than sufficient to demonstrate Lilly is likely to prevail on its quality-control claims.

Moreover, the quality-control risks are especially apparent here given that Trulicity® and Mounjaro® are cold-chain products that must be kept at refrigerated temperatures. The Defendants' sale of these black-market goods violates Lilly's temperature quality-control procedures in two ways: first, by putting the box in the hands of a patient, making it impossible to know whether and how long it was refrigerated; and second, by taking that box and shipping it to pharmacies around the country without any of the tested temperature controls or temperature monitoring that protect authentic Lilly-branded products and ensure no temperature-deviated products end up in the hands of patients. *See Gilead Scis., Inc. v. Meritain Health Inc.*, No. 24-cv-03566 (JRR), 2025 WL 1745669, at *12-13 (D. Md. June 24, 2025) (finding lack of temperature controls and temperature monitoring rendered diverted medicines infringing under the quality-control doctrine).

The Defendants' sale of black-market Lilly-branded medicines also violates and undermines Lilly's quality-control efforts in several other ways. As set forth above, the diversion of Lilly's products from their secure, authorized distribution chain into the black market undermines Lilly's ability to execute targeted recalls, if needed, which is a quintessential violation of the quality-control doctrine. *Zino Davidoff*, 571 F.3d at 245 (holding the sale of product that interfered with the manufacturer's ability to issue targeted recalls to be infringing, and finding it irrelevant (a) whether the manufacturer had in fact ever issued such a recall and (b) whether consumers or distributors knew of the manufacturer's recall procedures or how they were being

undermined). And the Defendants' false, inaccurate, and/or missing documentation in connection with their sales of Lilly-branded medicines further interferes with targeted recalls and more generally interferes with Lilly's ability to track and trace suspect products as part of a quality investigation. *See Safe Chain*, 684 F. Supp. 3d at 67 (holding "pedigrees serve an important quality control function because they allow [the manufacturer] 'to track the manufacture and packing of the product' and 'are designed to expedite recalls in the event of any problems with the health, safety' or integrity of its products" (quoting *Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 357 (E.D.N.Y. 1998)).

Any of these violations of the quality-control doctrine would be sufficient to render the Defendants liable under the Lanham Act. Taken together, there is no room for doubt that Lilly is more than likely to succeed on its claims.

**b. The Material-Differences Doctrine**

Related to the quality-control doctrine is the material-differences doctrine, which provides that reselling a markholder's goods is an act of infringement if those goods "differ materially from the product authorized by the trademark holder for sale." *Zino Davidoff*, 571 F.3d at 243 (citing *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987)). Courts "apply a low threshold of materiality, requiring no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product." *Id.* Differences in product-accompanying documentation can be material. *See*, *e.g.*, *Original Appalachian Artworks*, 816 F.2d at 73 (finding, in the case that established the doctrine, a doll to be materially different where the doll itself was identical but came with a different documentation inside the packaging); *Zino Davidoff*, 571 F.3d at 246 (holding that visible damage to a label is also a material difference because it "detracts from the value of the product" by suggesting to consumers and retailers that the product is "inferior and perhaps suspicious" or "otherwise

untrustworthy"); *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d 374, 386 (E.D.N.Y. 2008) (holding "a prospective consumer of these products would certainly want to know when they expire in order to avoid any ill effects," and that "batch codes enable manufacturers to identify the products to be recalled. The absence of such batch codes further supports a finding that there are material differences between the Plaintiff's and Defendants' products."); *Janssen Scis. Ireland Unlimited Co. v. TLC Xpress Pharmacy Inc.*, No. 22-cv-1983 (BMC), 2025 WL 974299, at *7 (E.D.N.Y. Apr. 1, 2025) (finding missing outserts on bottles of HIV medicine a material difference).

Here, as set forth above, the black-market medications sold by the Defendants materially differ from authentic Lilly-branded medicines in several ways, including through significant damage to the boxes, marking on the boxes, and patient-label residue; opened boxes and missing Patient Information Documents; and partially filled boxes. As a matter of black-letter law, these materially different products are infringing under the Lanham Act. *E.g.*, *Zino Davidoff SA*, 571 F.3d at 246.

**c. Counterfeiting**

The black-market boxes of Lilly-branded medicines at issue are not just infringing as a matter of law. They are also counterfeit products under the Lanham Act, and so the Defendants are liable for counterfeiting under 15 U.S.C. § 1114. "[A] product which was originally manufactured by the trademark holder but is materially different may become a counterfeit product, 'despite the use of the true manufacturer's mark.'" *Coty Inc. v. Cosmopolitan Cosmetics Inc.*¸ 432 F. Supp. 3d 345, 353 (S.D.N.Y. 2020) (quoting *Tiffany and Co. v. Costco Wholesale Corp.*, No. 13-CIV-1041 (LTS) (DCF), 2019 WL 120765, at *8 (S.D.N.Y. Jan. 7, 2019)). Indeed, in one of the seminal cases that established the material-differences doctrine, the Ninth Circuit held that a material difference "may well turn an otherwise 'genuine' product into a 'counterfeit'

one." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 638 (1st Cir. 1992); *see also Coty*, 432 F. Supp. 3d at 353 (quoting *Nestle*, 982 F.2d at 638).

Courts find materially different products (including those that violate the quality-control doctrine) are counterfeits when they are altered, advertised, sold, or distributed in a manner likely to trick or deceive purchasers into believing they are buying new, authentic products. For example, in *Coty*, the defendants sold the plaintiff's trademarked bottles of perfume in damaged packaging, with removed or obscured production codes the manufacturer relied upon for anti-counterfeiting purposes. 432 F. Supp. at 349-50. The Defendants removed the codes "to conceal the identity of the seller who is diverting the products outside of authorized distribution channels." *Id.* The *Coty* court not only found the mutilated bottles to be materially different and violative of the quality control doctrine but also found them to be "counterfeit goods" because the products were "not authorized for resale" and "sold in an intentionally fraudulent manner by which to trick consumers into believing they are the genuine article despite the material difference." *Id.* at 353 (cleaned up). Here, the Defendants are fraudulently selling materially different boxes of Lilly-branded medicine as though they are new, authentic products, but in reality have been purchased back from patients on the street. *See supra* at pp. 16-32. In furtherance of the scheme, the Defendants use false or missing documentation and the removal of prior patient labeling to conceal the products' black-market origins, and to hide the fact that these cold-chain products were stored under unknown conditions for an unknown period of time before being resold. *Supra* pp. 18, 20-21, 27-28, 30, 31. Under these circumstances, the black-market Lilly goods have been rendered counterfeit as a matter of law. *Coty*, 432 F. Supp. 3d at 349, 353; *Aini*, 540 F. Supp. 2d at 384-388 (E.D.N.Y. 2008) (applying the quality-control and material-differences doctrines and concluding products obtained without authorization on the secondary market were counterfeit, regardless of whether

those products were the "prior versions" of plaintiff's currently marketed product); *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 897 (9th Cir. 1997) (finding defendants' resale of used Westinghouse breakers, which defendants cleaned as sold as new, constituted trademark counterfeiting, even where the products bore Westinghouse's original trademarks as applied by Westinghouse itself).

In addition, the Defendants go even further to trick their customers into believing they are buying new, authentic Lilly medicines: they sell the medicines on online Platforms to hide: (1) their unlawful sales from Lilly and law enforcement; and (2) their identities from all entities except the Platform and the ultimate purchaser. Under well-established law, the boxes of Lilly medicines the Defendants sell on those Platforms are counterfeits under the Lanham Act. *See also See Pain Relief*, ECF Nos. 12-14 (granting an *ex parte* TRO, asset freeze order, expedited discovery order, and seizure order – the last of which is available only where the products are counterfeit – based on evidence that defendants sold already-dispensed medicine as new on online Platforms, including by removing patient labeling that damaged the medicine packaging).

The instant case falls squarely under the holdings of two other recent cases from this District, both of which found the sale of black-market prescription drugs that had been purchased from patients off the street to be counterfeit, in addition to being infringing under the quality-control doctrine. *Safe Chain*, 684 F. Supp. at 66-67 (holding that the once-authentic prescription medications were counterfeits under the Lanham Act, where they had been repurchased from patients off the black market and resold as new, which "subvert[ed] [plaintiff's] quality control efforts," and the defendants' sales "concealed the fact that the bottles were acquired from street-level buy back operations"); *Janssen Scis. Ireland Unlimited Co.*, 2025 WL 974299, at *1-2, *4-5, *10 (on a motion for summary judgment, holding plaintiff set forth sufficient disputed evidence

of "black-market-sourced bottles" of prescription medications with "falsified or missing pedigrees" for jury to find infringement under the quality-control doctrine, and further holding as a matter of law that all such infringing products also "are counterfeit" within the "Lanham Act's definition of a counterfeit").

**d. The First-Sale Rule Does Not Apply**

The Defendants cannot as a matter of law assert the first-sale rule, also known as trademark exhaustion. Generally speaking, the first-sale rule provides that a manufacturer cannot use its rights as a markholder to control the downstream distribution of its genuine products. *E.g.*, *Energizer Brands, LLC v. My Battery Supplier, LLC*, 529 F. Supp. 3d 57, 62 (E.D.N.Y. 2021). But the material-differences and quality-control doctrines are well-established exceptions to the first-sale rule. *Id.* (first-sale doctrine does not apply "if the resold goods are materially different or are sold in contravention of legitimate, established, substantial, and nonpretextual quality-control measures that the trademark holder follows); *Coty*, 432 F. Supp. 3d at 349 ("There are two exceptions to the First Sale Doctrine that are relevant to Plaintiffs' claims: the Quality Control Exception and the Material Difference Exception"); *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (MDG), 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015) (granting preliminary injunction against sale of materially different medical devices, and finding the first-sale rule does not apply in the context of material-difference and quality-control doctrines), *aff'd*, 670 F. App'x 6 (2d Cir. 2016).

Courts often explain this exception by noting the first-sale rule only applies to the sale of "genuine" products, but importantly, materially different products – including those that are not subject to the manufacturer's quality controls – are not genuine within the meaning of the Lanham Act. *E.g.*, *Bel Canto Design Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 222-23 (S.D.N.Y. 2011) (under the first-sale rule, the "Lanham Act does not give mark holders the right

to control subsequent, non-authorized resales, as long as the product sold is genuine," but "when a trademarked product that is being resold is 'materially different' from the product as it is sold by the plaintiff, it is not a 'genuine' article"); *Shell Oil Co. v. Com. Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (noting the first-sale rule applies only to "genuine" product, and holding "[a] product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer."). Counterfeit products, of course, are also not "genuine" within the meaning of the Lanham Act and also fall outside the scope of the first-sale rule. *See, e.g.*, *Coty*, 432 F. Supp. 3d at 353.

### 2. Consumer Confusion Is Presumed, and the *Polaroid* Test Does Not Apply

In typical trademark infringement cases, likelihood of confusion is measured by the Second Circuit's multi-factor *Polaroid* test. *See Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)). However, the *Polaroid* test presumes the existence of two entities using two similar, but not identical, marks and thus is "inapplicable" in cases involving the material-differences or quality-control doctrines. *Novartis Animal Health US, Inc. v. LM Connelly & Sons, Pty. Ltd*, No. 04 Civ 10213 (BSJ), 2005 WL 1902085, at *3 n.3 (S.D.N.Y. Jun. 14, 2005); *see also, e.g.*, *Prince of Peace Enters. v. Top Quality Food Mt, LLC*, No. 07 Civ. 00349 (RJH), 2007 WL 704171, at *4 (S.D.N.Y. Mar. 7, 2007) (holding the *Polaroid* test "is not useful in the context of [materially different] gray market goods, since such goods typically utilize the exact same marks, sold in the original packaging legitimately obtained from the manufacturer.") (cleaned up). Rather, the existence of a material difference "creates a presumption of consumer confusion as a matter of law." *Nestle*, 982 F.2d at 640; *see also, e.g.*, *Martin's Herend Imps., Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1301 (5th Cir. 1997) (courts "presume[] a likelihood of confusion as a matter of law when the products are materially different.").

For similar reasons, the same is true in the context of counterfeit goods. *E.g.*, *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 153-54 (E.D.N.Y. 2016) ("In the counterfeiting context, however, the court need not undertake an exhaustive analysis of the *Polaroid* factors because 'counterfeit marks are inherently confusing.'" (quoting *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F.Supp.2d 585, 596–97 (S.D.N.Y.2010)); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[T]he Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion.").

### 3. Each Defendant Is Individually Liable for Infringement

Each pharmacy defendant that sold the infringing product is, of course, liable for its infringement. But any party, including individual owners, officers, or agents of corporate entities, who was "a moving, active, conscious force behind the defendant corporation's infringement" is also individually liable, on a joint-and-several liability basis. *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014) (cleaned up); *see Matsunoki Grp., Inc. v. Timberwork Or., Inc.*, No. 08-cv-04078 (CW), 2009 WL 1033818, at *4 (N.D. Cal. Apr. 16, 2009) ("A plaintiff may show that a corporate employee is [a] moving, active, conscious force behind the infringing activity by demonstrating that [he or she] direct[ed], control[led], ratifie[d], *or* participate[d] in the infringing activity."). Thus, there may be – and in large-scale operations, almost always are – multiple people who are individually liable for the same company's counterfeiting. In other words, it is no defense to argue that others "had more significant roles in executing the operation." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 173, 178 (E.D.N.Y. 2016).

Here, the individual defendants fall into two categories. The first are the owners and principals of corporate defendants, which are small-business independent pharmacies that they are

purposefully using to sell infringing, black-market Lilly-branded medicines through online Platforms. There can be little doubt that they directed, controlled, ratified, or participated in that infringing activity. The second category of individual defendants are the supervising pharmacists of those pharmacies – a position that requires them to ensure the pharmacy's compliance with applicable laws and regulations and to ensure the legitimacy of the medicines the pharmacy sells. *See supra* n.17. At minimum, by virtue of their position and statutory duties, the supervising pharmacists also ratified the sale of these infringing medications, and so Lilly is likely to succeed on its claims against them as well.

#### 4. The Defendants Are Willful Infringers, but Lilly Needs to Establish Only Strict Liability

Notably, while there is strong evidence in the record that the Defendants knowingly and willfully trafficked in infringing products, all trademark infringement under the Lanham Act is a strict-liability offense. *E.g.*, *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("[I]t is well established that wrongful intent is not a prerequisite to an action for trademark infringement ... and that good faith is no defense." (cleaned up)); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act."); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003); *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2004). Thus, to succeed on its Lanham Act claims, Lilly does not need to demonstrate any knowledge or intent on behalf of the Defendants, and as a matter of law there is no "innocent infringer" or similar defense available to Defendants. *See, e.g.*, *Sunward Elecs., Inc.*, 362 F.3d at 25. Lilly's Lanham Act claims are not merely likely, but virtually certain to succeed.

### C. Lilly Is Suffering Irreparable Harm as a Result of Defendants' Activities

Because Lilly has demonstrated a likelihood of success on the merits on its Lanham Act claims, it is "entitled to a rebuttable presumption of irreparable harm" as a matter of law pursuant to the Trademark Modernization Act of 2020. 15 U.S.C. § 1116(a).

Even without that presumption, where, as here, a Lanham Act plaintiff has succeeded in showing a likelihood of confusion, irreparable injury "almost inevitably follows." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971). The reason is simple: "because the losses of reputation and goodwill and subsequent loss of customers that Plaintiff will suffer are not precisely quantifiable[,] remedies at law cannot adequately compensate Plaintiff for its injuries." *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 270 (E.D.N.Y. 2011); *see also Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 44 (2d Cir. 1986) ("[A]llowing defendants the opportunity to reduce the marks' reputational value and goodwill by its continued unauthorized use constitutes the irreparable harm that is requisite to the issuance of the preliminary injunction."); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y 2010) ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard.").

There is no question that the Defendants' sale of infringing and counterfeit Lilly-branded medicines is causing great harm to Lilly's goodwill, and that the continued sale of these products will irreparably harm Lilly. *See* Trunko Decl. ¶ 8. Immediate injunctive relief is, therefore, necessary to prevent further damage to Lilly's reputation and goodwill – and, of course, to patient health and safety, none of which can be undone.

### D. The Balance of Equities Tips Decisively in Lilly's Favor

Here, the equities emphatically support the issuance of a temporary restraining order. First and foremost, the counterfeit and infringing medicines at issue pose a serious threat to patient health and safety. *See supra* pp. 34-36. Quite apart from the harm to Lilly's goodwill, this threat to public health justifies immediate injunctive relief. *See, e.g.*, *Burger King Corp. v. Stephens*, No. 89-CV-7691, 1989 WL 147557 at *12-13 (E.D. Pa. Dec. 6, 1989).

Because the law recognizes no excuse for selling counterfeit or infringing goods, the harm to Lilly should the requested injunction be denied far outweighs the harm to the Defendants if their conduct is preliminarily enjoined. Each and every sale of infringing and counterfeit Lilly-branded medicine infringes Lilly's trademarks, causes harm to Lilly's reputation, and places patients at risk. *See Microsoft Corp. v. ATEK 3000 Computer, Inc.*, No. 06-CV-6403 (SLT)(SMG), 2008 WL 2884761, at *5 (E.D.N.Y. Jul. 23, 2008). The Defendants have no right to sell black-market medicines obtained off the street. The Defendants thus cannot validly claim hardship based on the proposed injunctive relief.

### E. An Injunction Is in the Public Interest

The public interest in an injunction is self-evident in this case. It is in the public interest to prevent the sale of counterfeit and infringing Lilly-branded medicines. It is in the public interest to prevent patients from receiving potentially dangerous black-market medications that must be maintained at refrigerated temperatures but have been stored and shipped in unknown conditions, including by patients who sold the medicine on the street. And it is in the public interest to prevent confusion and protect informed choice, especially when patients' health is at stake. *Cytosport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) ("When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation.")

(citation omitted), *aff'd*, 348 F. App'x 288 (9th Cir 2009); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.8 (7th Cir. 1988) ("[T]he relevant consideration" in determining whether the public interest will be served by the grant of an injunction "is the consumer's interest in not being deceived about the products they purchased." (cleaned up)).

Notably, there is no benefit to the patient in the Defendants' scheme: the patients who receive the black-market goods believe they are receiving authentic medication, and so they (or their insurers) pay full price for it. If given a choice between (1) new, authentic Lilly-branded medicine and (2) medicine that had been dispensed to a different patient by a different pharmacy, then purchased back from that patient and re-sold on the black market, no rational patient would willingly choose the latter.

## II. LILLY IS ENTITLED TO AN ORDER FREEZING DEFENDANTS' ASSETS

As part of its efforts to immediately remove this infringing and counterfeit medicine from the U.S. market, Lilly also seeks an asset freeze against the Defendants.

Under the Lanham Act, Lilly is entitled to an accounting and disgorgement of Defendants' illicit profits from their sale and distribution of infringing and counterfeit Lilly medicine that bears Lilly's trademarks. An *ex parte* asset freeze order will maintain the status quo, which includes preserving Lilly's ability to recoup the profits that the Defendants earned from the sale of the counterfeit and diverted Lilly-branded medicine. This relief is not merely consistent with, but critical to, putting an immediate stop to the Defendants' sale of diverted products in the United States.

### A. Legal Standard for Asset Freezes under the Lanham Act

Where, as here, a plaintiff seeks the equitable remedy of an accounting of profits under the Lanham Act, 15 U.S.C. § 1117, a federal court has the "inherent equitable powers to order

preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). The Second Circuit has joined its "sister circuits to have considered the issue" in holding that in trademark infringement actions, "the district court ha[s] the inherent equitable authority to issue [an] Asset Freeze Injunction." *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 130, 132 (2d Cir. 2014); *see also Safe Chain,* 684 F. Supp. 3d at 62 ("[T]he Court unquestionably has authority to freeze assets to preserve an equitable accounting of profits.") (citation omitted); *N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-cv-9083 (RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006) ("The purpose of freezing assets is to preserve security for [the] plaintiff's future recovery on an accounting of the counterfeiter's profits.") (cleaned up). The assets subject to this inherent authority include real property. Indeed, the Court in *Pain Relief*, *Safe Chain*, and *Khaim* issued asset freeze orders covering all real properties in which defendants had an ownership interest, and also named specific properties to be frozen. *See* Potter Decl. Exs. 2, 5, 11.

Motions for an asset freeze under the Lanham Act are evaluated under the familiar standard for a preliminary injunction. *See Shamrock Power Sales, LLC v. Scherer*, No. 12-cv-8959 (KMK)(JCM), 2016 WL 6102370, at *2 (S.D.N.Y. Oct. 18, 2016); *see also Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, No. 03-cv-4844, 2005 WL 3115892, at *13-14 (N.D. Ill. Nov. 8, 2005).

### B. Lilly Has a Strong Likelihood of Success on the Merits

As set forth above, the evidence leaves no room for doubt that the Defendants have sold counterfeit and diverted Lilly-branded medicines that bear Lilly's registered trademarks, are materially different from Lilly's genuine products, and do not comply with Lilly's quality-control standards. *See supra* pp. 36-40. That is all Lilly needs to establish to prevail on its strict-liability Lanham Act claims. *See supra* pp. 43.

### C. Defendants Are Likely to Dissipate Assets, and Lilly Will Suffer Additional Irreparable Harm If Defendants' Assets Are Not Frozen

Black-market unlicensed wholesalers like Defendants make their living by secrets and subterfuge, and therefore, are likely to "hide their allegedly ill-gotten funds" if their assets are not frozen. *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 563 (9th Cir. 1992); *accord Chanel, Inc. v. Classic-Bag-Shop*, No. 19-cv-60492 (UNGARO), 2019 WL 2638608, at *3 (S.D. Fla. Mar. 14, 2019) ("In light of the inherently deceptive nature of the counterfeiting business … Plaintiff has good reason to believe Defendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless those assets are restrained."). Indeed, as set forth above, the Defendants sell their black-market medicines on the Platforms precisely because it allows them to evade scrutiny from mark holders, regulators, and law enforcement. Even in the limited number of purchases that the cooperating pharmacies were able to make, each of the Defendants provided black-market products that bore clear signs of having been purchased from patients off the street and then processed for resale.

When engaged in the practice of selling black-market prescription drugs, serious civil and criminal exposure is a given – as the indictments of many of the Defendants in *Safe Chain* and *Khaim* highlight. The Defendants here operate in a heavily regulated industry and rely on fraud and subterfuge to sell black market goods to U.S. patients. Many of the Defendants are repeat fraudsters, *see supra* pp. 19-20, 27, 30. It is highly likely that Defendants will conceal or dissipate their illegal profits if given the chance. *See Lorillard Tobacco Co.*, 2005 WL 3115892, at *16 ("In this case, the Lanham Act provides [Plaintiffs] with the equitable remedy of recovering the [Defendants'] profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible." (quoting *Levi Strauss &*

*Co.*, 51 F.3d at 987; *Reebok*, 970 F.2d at 559))); *see also infra* pp. 50-54 (discussing need for *ex parte* injunctive relief).

### D. The Balance of the Equities Strongly Favors Lilly

The balance of harms also heavily weighs in favor of an asset freeze. The evidence shows that the Defendants sold counterfeit and infringing black-market medicines in violation of the Lanham Act, and when asked for the pedigree information they were legally required to maintain, refused to provide any information or take any steps to ameliorate the harm they caused. Any harm an asset freeze may cause to the Defendants was "brought upon themselves with their tactics of deception and underhandedness." *Lorillard Tobacco Co.*, 2005 WL 3115892, at *17. By comparison, the harm caused by Defendants' actions – both to unsuspecting patients and to Lilly's trademarks and goodwill – is clear.

To the extent that the Defendants can demonstrate – contrary to the overwhelming evidence – that their assets are not the fruits of their wrongdoing, they can make such a showing to the Court and have the freeze lifted or amended. *See Balenciaga Am., Inc. v. Dollinger*, No. 10-cv-2912 (LTS), 2010 WL 3952850, at *7-8 (S.D.N.Y. Oct. 8, 2010). Defendants can also move to have sufficient funds released to pay their lawyers and other necessary expenses, and Lilly can reach amicable stipulations with Defendants allowing them access to necessary funds. Lilly, on the other hand, will have no recourse if the Defendants dissipate their assets. *See Dong v. Miller*, No. 16-CV-5836 (NGG) (JO), 2018 WL 1445573, at *10-11 (E.D.N.Y. Mar. 23, 2018). Once hidden or removed from the Court's reach, very little can be done to recover a black-market infringer's assets.

### E. The Public Interest Is Served by an Asset Freeze

An asset freeze is in the public interest because it will help secure the Defendants' participation in this lawsuit and ensure they do not continue to purchase and sell diverted medicines

during the course of litigation. *See Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) ("[A] court of equity … may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved."). There will be no harm to the public from the asset freeze, as there is no shortage of legitimate pharmacies who can dispense authentic Lilly-branded medicine to patients.

### F. The Asset Freeze Should Be Global in Scope

Further, the Court should freeze all assets Lilly can identify no matter those assets' location, as the Court's authority to freeze assets is not limited to assets within this District, nor even to assets within the United States. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, [a district court] has authority to order it to 'freeze' property under its control, whether the property be within or without the United States."); *see also, e.g., Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991) (upholding district court order directing "banks or financial institutions wherever located to freeze the judgment debtors' assets." (internal quotation marks omitted)); *Iron Maiden Holdings Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 1:18-cv-1098, 2018 WL 2077732, at *3-4 (N.D. Ill. Mar. 6, 2018) (issuing asset restraining order on "[a]ny banks, savings and loan associations, payment processors or other financial institutions, including ... PayPal, ... for any Defendant"); *Balenciaga*, 2010 WL 3952850, at *7-8 ("In light of the determination that the Court has personal jurisdiction over the Individual Defendants, the Court has authority to freeze their assets within or without the United States." (quotations omitted)).

## III. THE COURT SHOULD ISSUE THE REQUESTED INJUNCTIVE RELIEF *EX PARTE*

Rule 65(b)(1) of the Federal Rules of Civil Procedure authorizes the Court to issue a TRO and asset freeze *ex parte* where "specific facts in an affidavit or a verified complaint clearly show

that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."[18] The evidence set forth above and introduced by accompanying declarations readily meets this standard. If given the opportunity, it is extremely likely that the Defendants will transfer, conceal, or destroy their ill-gotten gains, the infringing products, and the records of their illegal activity, which will at minimum severely hamper Lilly's ability to remove these potentially dangerous medications from the market and obtain final equitable relief.

The pre-suit evidence clearly shows that each of the Defendants sold infringing and counterfeit versions of Lilly-branded prescription medicines, illegally purchased from patients on the black market and resold as new on a *de facto* virtual black market, using pharmacy-to-pharmacy Platforms that are designed to be invisible to manufacturers and law enforcement. *See supra* pp. 12-13. Each of the Defendants used false or missing documentation to conceal the black-market origins of the product they were selling. *See supra* pp. 18, 20-21, 26-27, 30-31, 32. Moreover, the Defendants are all pharmacists, pharmacies, or their owners, and so are well aware of the cold-chain requirements from these medicines, and that they are putting patients at risk by reselling product that was stored under unknown conditions by a patient who later illegally resold that medication for cash. *See supra* pp. 7-8.

Moreover, as pharmacists, pharmacies, and pharmacy owners, the Defendants are all well aware of their criminal exposure. While all counterfeiting is criminally punishable, *see* 18 U.S.C. § 2320, Congress made the sale or receipt of a misbranded prescription drug strict-liability crime. *See* 21 U.S.C. §§ 331(a)-(c), 333(a). Regardless of whether the Defendants are aware of the recent federal criminal prosecutions against sellers of prescription drugs that had been repurchased from

---

[18] Rule 65(b)(1) also requires that "the movant's attorney certif[y] in writing any efforts made to give notice and the reasons why it should not be required"; that certification and explanation is set forth in the Declaration of Geoffrey Potter at paragraph 3.

patients, by virtue of their profession they are undoubtedly aware of the professional and criminal consequences of their scheme.

In short, the evidence shows that the Defendants are all knowingly engaged in a criminal scheme to sell black-market, counterfeit prescription drugs and put them in the hands of innocent patients, and take active steps to conceal their infringing and criminal activity from their customers and from law enforcement. Courts in this District have recently issued *ex parte* TROs and asset freeze orders against dozens of sellers of black-market prescription drugs that were repurchased from patients off the street, including against pharmacies, pharmacists, and pharmacy owners. Potter Decl. ¶¶ 7-8 and Exs. 1-2, 4-5, 7-8, 10-11 (setting forth *ex parte* TROs and asset freeze orders issued in other cases involving counterfeit and materially different pharmaceuticals and medical devices).

Sellers of black-market prescription drugs typically utilize money-laundering schemes, ranging from the relatively straightforward to the highly complex, to conceal their ill-gotten gains and to continue funding their scheme. *See, e.g.*, *Khaim*, No. 24-cv-04259, ECF Nos. 89, 89-1 (evidence defendants used web of shell companies for the apparent purpose of laundering counterfeiting proceeds); *Pain Relief*, No. 26-cv-02172, ECF Nos. 5, 5-35 (same). *Ex parte* asset freeze injunctions are the only viable method of preventing these knowingly criminal actors from transferring, dissipating, or absconding with their illicit gains, and the disclosure requirements of an asset freeze injunction allow mark holders to immediately "follow the money" and identify additional funds and additional players involved in the scheme. Potter Decl. ¶¶ 9-10; *see also* *Reebok* 970 F.2d at 563 (noting that those engaged in selling counterfeits are likely to "hide their allegedly ill-gotten funds"); *Chanel,* 2019 WL 2638608, at *3 ("In light of the inherently deceptive

nature of the counterfeiting business … Plaintiff has good reason to believe Defendants will hide or transfer their ill-gotten assets.”).

Similarly, providing notice to sellers of black-market prescription drugs will simply encourage them to sell, transfer, or destroy their stock of counterfeit Lilly-branded medicine before the Court has an opportunity to act. *See, e.g.*, 1984 U.S.C.C.A.N. at 3632-33 (Congressional finding made in connection with the passage of the Counterfeiting Act that “many of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon.”). Here, the black-market products are prescription medicines: small, lightweight, easily movable, and extremely high-value products. Tens of millions of dollars’ worth of these products can fit in the trunk of a car and be driven away on a moment’s notice, to be hidden, resold, or destroyed. Indeed, in a recent case brought by the undersigned counsel in this District on behalf of a different pharmaceutical company, the plaintiff sought a TRO on very short notice against sellers of infringing, materially different medical devices – and in the approximately 24 hours that elapsed between defendants receiving notice of the suit and the Court signing the TRO, the largest illegal wholesaler simply emptied its warehouse of all the infringing goods, putting hundreds of units back into circulation without violating any Court order. Potter Decl. ¶ 10.

This Court should not allow the Defendants here, who are selling black-market versions of a prescription drug that poses a health and safety risk to patients, the opportunity to do the same. Lilly respectfully submits that it has satisfied the requirements of Rule 65, and this Court should issue the requested initial injunctive relief *ex parte*. *See AT&T Broadband v. Tech Commc’ns, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004) (affirming *ex parte* asset freeze order that was issued based on the declaration of “an attorney who represented [another plaintiff in the same industry]

in similar litigation," presenting counsel's experience that "defendants charged with [similar] violation[s]" are likely to conceal assets and infringing products); *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979) (granting plaintiff's writ of mandamus where district court declined to issue an *ex parte* TRO, finding that where "a likelihood of product confusion exists" because "the allegedly counterfeit [] merchandise is virtually identical to the genuine items" and "in a case such as this one … notice [to defendants] all too often appears to serve only to render fruitless further prosecution of the action," then "a plaintiff is entitled to have issued an *ex parte* temporary restraining order").

## IV. LILLY IS ENTITLED TO EXPEDITED DISCOVERY

Lilly also respectfully seeks a limited expedited discovery order so that it may quickly (a) investigate the distribution of counterfeit and infringing Lilly-branded medicines in an effort to permanently banish them from the market and (b) trace and freeze Defendants' proceeds from the infringement to prevent them from being used to buy more black-market products and preserve Lilly's ability to recover its damages. The expedited discovery order proposed here is substantially similar to orders previously granted by judges in this District in anti-diversion and anti-counterfeiting actions involving *ex parte* seizures, including *Pain Relief*, *Safe Chain*, and *Khaim*, examples of which are attached as Exhibits 3, 6, and 12 to the Potter Declaration.

Federal courts have broad discretion to expedite the normal pace of discovery in cases seeking temporary or preliminary injunctive relief. Title 28 U.S.C. § 1657 directs that "the court shall expedite the consideration of ... any action for temporary or preliminary injunctive relief." Rule 26(d) of the Federal Rules of Civil Procedure allows for expedited discovery and an Advisory Committee comment to that rule notes that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." Fed. R. Civ. P. 26(d) and Advisory Comm. Note.

Rule 30(a)(2)(A)(iii) provides that the Court may grant leave to take depositions "before the time specified" in the discovery rules. Similarly, Rule 34(b)(2)(A) provides that "[a] shorter or longer time may be ... ordered by the court" for the production of documents than the rules would otherwise allow.

The standard for obtaining expedited discovery closely resembles the standard for obtaining preliminary injunctive relief. Four factors must be considered: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury [that] will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.,* 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

Like injunctive relief, expedited discovery "is routinely granted in actions involving infringement and unfair competition." *Benham Jewelry Corp. v. Aron Basha Corp.*, No. 97-CV-3841 (RWS), 1997 WL 639037, at *20 (S.D.N.Y. Oct. 14, 1997). There are numerous examples from within this Circuit in trademark cases involving conduct far less extreme than the sale of black-market medicine. *See*, *e.g.*, *Philip Morris USA, Inc. v. Jackson*, 826 F. Supp. 2d 448, 450 (E.D.N.Y. 2011); *GAKM Res. LLC v. Jaylyn Sales, Inc.*, No. 08-CV-6030 (GEL) (THK), 2009 U.S. Dist. LEXIS 128595, at *3 (S.D.N.Y. May 21, 2009); *Cartier Int'l B.V. v. Ben-Menachem*, No. 06-CV-3917 (RWS), 2008 WL 64005, at *1 (S.D.N.Y. Jan. 3, 2008); *Johnson & Johnson v. Champion Sales, Inc.,* No. 06-CV-5451 (SLT), ECF No. 3 (E.D.N.Y. Oct. 7, 2006); *ALCOA, Inc. v. ATM, Inc.,* No. 04-CV-5225 (DRH), ECF No. 9 (E.D.N.Y. Dec. 2, 2004); *The Procter & Gamble Co. v. Xetal, Inc.,* No. 04-CV-2820 (DRH), ECF No. 3 (E.D.N.Y. July 7, 2004); *Chere Amie, Inc.*

*v. Windstar Apparel Corp.*, 191 F. Supp. 2d 343, 344-45 (S.D.N.Y. 2001); *Hoffman-La Roche, Inc. v. Medisca, Inc.*, No. 99-CV-163, 1999 WL 123578, at *2 (N.D.N.Y. Mar. 3, 1999); *Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.,* 924 F. Supp. 17, 18 (S.D.N.Y. 1996); *Francis S. Denney, Inc. v. I.S. Labs., Inc.*, 737 F. Supp. 247, 248 (S.D.N.Y. 1990); *Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia S.P.A.*, 678 F. Supp. 1049, 1055 (S.D.N.Y. 1987), *aff'd*, 847 F.2d 53 (2d Cir. 1988); *Playskool, Inc. v. Prod. Dev. Grp., Inc.*, 699 F. Supp. 1056 (E.D.N.Y. 1988).

Applying the four factors set forth in *Gidatex*, and based on the wealth of authority cited above, the Court should grant the limited expedited discovery that Lilly seeks. The first two factors are readily met: (1) Lilly has already demonstrated a likelihood of infringement; and (2) its business reputation and goodwill are being irreparably harmed. As for the third factor, discovery is a critical first step in exposing, and then stopping, this unlawful activity. Expedited discovery will allow Lilly to prepare for, and the Court to conduct, a prompt preliminary injunction hearing. It will also enable Lilly to identify other persons and entities involved in obtaining and distributing counterfeit and infringing Lilly-branded medicines. *See e.g.*, *Twentieth Century Fox Film Corp.,* 749 F. Supp. at 475 (allowing discovery to proceed "on an expedited basis may very well lead to evidence of continuing infringement by [these] defendant[s] or others; it may also lead to the discovery of future plans to infringe or the discovery of additional infringing merchandise."). Lilly is eager to quickly put an end to Defendants' scheme, and thus seeks expedited discovery from certain non-parties including the Platforms that possess critical information about the sales of Lilly-branded medicines *outside* of the authorized supply chain in a manner that violates Lilly's quality control procedures. Discovery from the Platforms on an expedited basis is essential to achieving that goal. As explained herein*, see supra* p. 13, discovery alone will allow Lilly to

identify potential co-conspirators and the scope of Defendants' scheme since Defendants' identities are hidden on the Platforms by design.

Finally, with respect to the fourth factor, the harm to Lilly if discovery proceeds at the ordinary pace will far outweigh any conceivable harm to the Defendants should this request for expedition be granted. The scope of discovery is narrow. *See Fed. Express Corp. v. Fed. Espresso, Inc.*, No. 97-CV-1219, 1997 WL 736530, at *2 (N.D.N.Y. Nov. 24, 1997) ("[T]he scope of permissible expedited discovery is limited to requests that are more narrowly 'tailored to the time constraints under which both parties must proceed [and] to the specific issues that will have to be determined at the preliminary injunction hearing.'"). The proposed timetable calls for document production within a week of service of the request and depositions on a week's notice. These documents should be at the Defendants' disposal, and Defendants will suffer little if any "injury" from having to produce them sooner rather than later. Conversely, without expedition, Lilly and the public will continue to be harmed by each and every additional sale of counterfeit medicine.

## CONCLUSION

For the reasons stated above, the Court should grant Lilly's *ex parte* motion for a temporary restraining order (to be followed by a preliminary injunction), an asset freeze order, and an expedited discovery order, and should award any other and further relief that the Court may deem just and proper. Proposed orders for the requested relief are being filed simultaneously herewith.

Dated: June 9, 2026

PATTERSON BELKNAP WEBB & TYLER LLP

By: [signature]

Geoffrey Potter
Timothy A. Waters
Isaac Weingram
Caroline Zielinski
Anna Petrocelli

1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E: gpotter@pbwt.com
twaters@pbwt.com
iweingram@pbwt.com
czielinski@pbwt.com
apetrocelli@pbwt.com

*Attorneys for Plaintiff*

**CERTIFICATION OF WORD COUNT COMPLIANCE**

I hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law contains 16,032 words (excluding the caption, table of contents, table of authorities, and signature block), and that I have relied upon Microsoft Word's word count for purposes of this certification.

Geoffrey Potter